## { Catlin *against* Robinson.

The interest of a vendee of land being in proportion to the amount of purchase money actually paid, is separately bound by a judgment and may be separately sold in an execution, leaving the legal estate, and so much of the equitable estate as has not been paid for, untouched in the vendor : and a judgment against the vendor binds the legal estate but to the value of the unpaid purchase money, and just so much can be levied and sold : consequently, a purchaser under a judgment against either, like a purchaser from either by voluntary conveyance, succeeds but to the interest which the debtor had power to incumber or part with.

No one will be permitted to make defence who would not be prejudiced by the judgment ; consequently he who may come in as a terre-tenant must have an estate from the incumbrancer which might be bound by the incumbrance, whether judgment, mortgage or recognizance.

To open a judgment and let a defendant or terre-tenant into a defence, is the exercise of a judicial discretion, which, in the abstract, is not the subject of revision upon a writ of error ; but time may elapse, and circumstances may occur which will render it the exercise of such an excess of power as that the act may be annulled, and the original judgment be restored.

WRIT of error to *Susquehanna* county.

This was a *scire facias* upon a mortgage by Putnam Catlin, assignee of Horace Binney against John W. Robinson, in which a judgment was rendered on motion for the plaintiff on the 15th of November 1826, for 25,857 dollars ; on which a *levari facias* to September term 1826 was issued, and the mortgaged property was sold to the plaintiff, Putnam Catlin, for 5000 dollars. On the 30th of November 1829 a motion was made at the instance of Robert Eldridge and others, who were terre-tenants of the mortgaged land, to open the judgment and let them into a defence ; which was made absolute, and they severally pleaded payment with leave, &c. To the opinion of the court opening the judgment, an exception was taken by the plaintiff. On the trial of the cause, Robert Eldridge, one of the terre-tenants, offered the following evidence, which embraced the whole merits, as well of his defence, as of all the other terre-tenants.

"That on the 27th of October 1803, one Elias West made a written contract with Robert H. Rose, attorney in fact of Henry Drinker, then of the city of Philadelphia, now deceased—the then proprietor of a large body of lands, lying in the county of Luzerne, now Susquehanna, on the waters of Meshoppen, Wyalusing, Tuscarora, Tunkhannock and Harery's creeks, for the purchase of one hundred and fifty acres of the said land, with six per cent allowance for roads, &c. Which lot of land, so purchased of the said Elias West, as aforesaid, was duly surveyed by direction of the said Robert H. Rose.

And the said Elias West, in pursuance of such contract, entered into possession thereof, improved the same, and resided with his family thereon.    That some time after the making of the said contract the said Henry Drinker departed this life, having, by his last will and testament, authorised and empowered executors to sell and convey such parts of his real estate as they might think proper; in pursuance of which power they entered into a contract with John B. Wallace for the sale of twenty-two contiguous tracts of land, part of the said large body of lands, including the parcels as aforesaid sold to the same Elias West.    On the 21st day of July 1810, the said John B. Wallace convened the several settlers and others claiming interest in the said twenty-two tracts of land at the house of Joshua Kaynsford, Esq., in Bridgewater township, in said county of Susquehanna, and then and there entered into a new contract with the said settlers, the said Elias West being one of them, for the purchase, by the said settlers, of their respective lots of land, for the price and sum of 2 dollars an acre payable in equal instalments at the end of three, four and five years from the 1st day of January then next, with interest payable annually from the date of said contract—deeds to be given upon the purchasers respectively, and the payments to be secured by bonds—with letter of attorney and mortgage, which agreement was deposited in the hands of said Putnam Catlin, by mutual consent, for the use of all persons interested therein.    " That previous to the date of the last mentioned contract, Elias West had sold to one Edward Fuller, also a party to said contract, about fifty acres of his original purchase, he retaining one hundred acres with the allowance, &c., for which he contracted with John B. Wallace.

"And such of the said lands were surveyed thereupon, as were not previously surveyed under the contracts with the said Robert H. Rose, by direction of the said Putnam Catlin, then the attorney in fact of the said John B. Wallace, and a map thereof, including the lot so as aforesaid sold to the said Elias West, was thereupon made out and delivered to the said Putnam Catlin, for the common use and benefit of all concerned.

" That the said Elias West continued in possession of said lot, and enlarged his improvement, with much labour and expense, until the 29th day of April 1812, when he sold and conveyed his right and title thereto to one Samuel Kellum, who went into possession thereof, resided thereon and continued to improve said lot until the 17th of August 1815, when he sold and conveyed his interest in said lot of land to the said Robert Eldridge for the consideration of 1355 dollars and 43 cents.    And the said Robert Eldridge thereupon went into possession thereof, and has continued to possess the same and reside thereon with his family to the present time, making valuable improvements at much labour and expense.

" In the latter part of the year 1814, the said Wallace convened the settlers on said lands, and the said Samuel Kellum, among others, at the house of Z. Deans, one of the said settlers, the said Putnam

Catlin being also present, at which time it was agreed between the said Wallace and the settlers, that deeds should be immediately executed to the said settlers, and bonds and mortgages given by them to secure the payment of the purchase money, according to the tenor and effect of the above mentioned contract; and Wallace then directed said Catlin, who held a letter of attorney from him with full power to convey lands, to make and execute the deeds and receive the securities, which Catlin declined doing under the pretence that he was going to be absent, and could not attend to it. Wallace then promised and agreed to make and execute the deeds forthwith, and cause them to be delivered, which was not done.

" On the 9th of February 1814, in pursuance of the contract by them previously made with the said John B. Wallace, as above is set forth, and in fulfilment thereof, the said executors named in the last will and testament of the said Henry Drinker, conveyed to the said John B. Wallace the legal title to the said twenty-two tracts of land, and the said John B. Wallace, on the 2d day of December in the year last aforesaid, conveyed the same to Horace Binney in trust to and for the sole and separate use of Susan Wallace, the wife of the said John B. Wallace, with power to sell and convey the same. And the said Horace Binney, by virtue of the said power to sell and convey contained in said deed, on the 8th of December, in the year last aforesaid, for and in consideration of the sum of 18,000 dollars to him secured to be paid by the said John W. Robinson, by deed indented, granted and conveyed the said twenty-two tracts of land to the said John W. Robinson in fee : and the said John W. Robinson, to secure the payment of the purchase money, then executed his bond to the said Horace Binney in the penal sum of 36,000 dollars; and a mortgage of the said twenty-two tracts of land in the usual and customary form, which is the same mortgage on which this suit is brought, it having been duly assigned and transferred to the said Putnam Catlin on the 29th day of October 1821. And the said John W. Robinson, on the said 8th day of December 1814, made a declaration under his hand and seal to the effect following, to wit : that whereas the said John B. Wallace had made divers contracts with settlers on the said lands for parts or parcels thereof, to the completion of which he was liable; he, the said Robinson, acknowledged that he took the said lands subject to such contracts, and engaged for himself, his heirs and assigns, to fulfil and complete the same, no mention being made of such contracts, at his, the said Robinson's request, that the deeds of conveyance to him might be clear and general, on the face of them.

" On the 22d of October 1818, the said Robert Eldridge tendered to the said John W. Robinson the whole amount of the purchase money, and interest due on said contract, for his lot of land, which Robinson counted, admitted the amount, and made a memorandum thereof, but refused to accept.

" On the 10th of November 1818, the said Robert Eldridge paid the

said J. W. Robinson, on account of his said lot of land, 175 dollars, and took said Robinson's receipt therefor ; and subsequently paid the whole balance due on said contract to said Robinson.

" And the said Robert Eldridge will further give in evidence, that the said John W. Robinson, having made divers and large payments to the said Horace Binney and Putnam Catlin in part payment of his said bond and mortgage, of moneys received by him from the purchasers of parcels of the said lands, sometime in the month of November 1826 entered into an agreement with the said Putnam Catlin, whereby the said John W. Robinson was released and discharged from the payment of the residue of the said debt, so secured by his bond as aforesaid, and of all the interest which might have accrued thereon and remained unpaid, and also of and from the payment of all such sums of money as he had received from the purchasers of parts and parcels of the said twenty-two tracts of land, and had not previously paid over to the said Horace Binney and Putnam Catlin. And it was also stipulated and agreed, that the said John W. Robinson should deliver up to the said Putnam Catlin all and every one of the mortgages, bonds, notes and other securities held by him for the payment of money of the said purchasers, and also all title papers, agreements and contracts relating to said lands, and confess a judgment in this case on the said mortgage, which agreement was duly carried into effect by the said parties. A judgment having in pursuance of said last mentioned agreement been confessed as aforesaid on the said mortgage, by the said John B. Wallace, without any notice to the said Robert Eldridge, a certain writ of *levari facias* was issued thereon, commanding the sheriff of said county to sell the said twenty-two tracts of land in the usual form ; in obedience to which writ he sold the same to the said Putnam Catlin, and on the 5th of December, in the last mentioned year, conveyed the same to the said Putnam Catlin in fee, for the nominal consideration of 5000 dollars, no part thereof being paid. And the said Putnam Catlin, on the 2d day of April 1827, made a declaration in writing, under his hand and seal, reciting the said purchase and conveyance to him by the said sheriff, and declaring that he did purchase and take all and singular the said twenty-two tracts of land, and that he continued to hold the same in trust for and to the benefit of the said Susan Wallace and her heirs and assignees, ' excepting such tracts or parts of tracts as had been duly released from the general mortgage of the said John W. Robinson to Horace Binney, and such tracts or parts of tracts as had been previously sold by the said John B. Wallace previous to the date of said mortgage, and were excepted at the sale by the sheriff;' which declaration was duly recorded in the office for recording of deeds in and for said county, on the the 3d day of April in the year last aforesaid. And that the said Putnam Catlin, on the 10th day of July 1828, by deed indented, fraudulently conveyed the said twenty-two tracts of land to one Susan P. Bradford, except such farms thereon as the said Put-

nam Catlin had, by deeds executed and recorded, conveyed to the several purchasers thereof, to the use of the said Susan P. Bradford, her heirs and assignees for ever.

"And the said Robert Eldridge will further give in evidence, that since the 4th of May 1826 he has had notice that the said John B. Wallace, prior to the date of the conveyance to him by the executors of the last will and testament of the said Henry Drinker, to wit, on the 3d of September 1805, entered into an article of agreement with the Corporation for the relief of poor and distressed Presbyterian ministers, and of the poor and distressed widows and children of Presbyterian ministers, for the purchase of divers tracts of land, and among others the said twenty-two tracts of land, for the price or sum of 1 dollar an acre; which article of agreement recited, that whereas the said twenty-two tracts of land were claimed by the said Henry Drinker, and it being uncertain whether his title or that of the corporation was the better, the said John B. Wallace covenanted and agreed that he would, at his own expense, take the steps necessary to have the rights decided, and if the decision were in favour of the corporation, they were to convey the same, or so much as should be recovered, to the said John B. Wallace in fee, and that he should give the corporation a bond, with a warrant to confess judgment, to secure the payment of the purchase money, which agreement and covenants have not been complied with nor fulfilled by the said John B. Wallace; whereby the said lands are incumbered to the amount of the said purchase money and interest, no part thereof having been paid."

To the admission of this evidence the plaintiff objected, but the court overruled the objection and admitted it; to which exception was taken. The court below were of opinion, that the evidence given was a good defence for the terre-tenant, and so instructed the jury, who found verdicts for them, upon which judgments were rendered.

*Conyngham*, for plaintiff in error.
*Jessup* and *Williston*, contra.

The opinion of the Court was delivered by

GIBSON, C. J.—In Auwater *v.* Mathiot, 9 *Serg. & Rawle* 402, we have the origin of a principle which resolves all difficulties in cases like the present. It was there determined that the interest of a vendee, being in proportion to the amount of purchase money actually paid, is separately bound by a judgment, and may be separately sold on an execution, leaving the legal estate, and so much of the equitable estate as has not been paid for, untouched in the vendor. The converse of that proposition received the sanction of this court in M'Mullen *v.* Wenner, 16 *Serg. & Rawle* 20, where it was determined that a judgment against the vendor binds the legal estate but to the value of the unpaid purchase money, and consequently that just so much could be levied and sold. And in Purviance *v.* Lemmon, 16

*Serg. & Rawle* 294, it was held that the purchaser under a judgment against either, like a purchaser from either by voluntary conveyance, succeeds but to the interest which the debtor had power to incumber or part with; consequently that purchasers respectively from the vendor and vendee, succeed but to their rights and responsibilities, the one being entitled to call for the purchase money as the representative of the vendor, and the other being entitled to call for a conveyance as the representative of the vendee. These principles have been cast upon us by our want of a court of chancery, and consequent departure from a rule of the common law, by which a judgment and execution operate but upon legal estates. But neither of the original parties has a pretext to step between the other and his creditor who proposes to sell, not the land, but his debtor's interest in it, leaving the residue untouched. The nature of this ownership of distinct but concurrent interests which either party may incumber by judgment or mortgage without disturbing the ownership of the other, seems to have been strangely misconceived in the court below, else it would have been perceived that it is decisive of the cause. It seems to have been thought that a sale on a *levari facias* divests all minor and derivative interests, without considering that a judicial sale extinguishes but liens and not estates. A judgment against a tenant in common affects not the estate of his co-tenant; and here the parties had in fact an interest in common in proportion to the amount of the purchase money paid or withheld. When Mr Wallace conveyed these lands to Mr Binney on certain trusts, a part of them were incumbered with contracts of sale made with settlers upon them by the agent of the original proprietor, and ratified by Mr Wallace at the time of his own purchase. As a trustee with notice, Mr Binney held the legal title subject to these contracts; and they might have been enforced against him on payment of the purchase money, or other performance of the conditions prescribed. What then did he part with when he sold to Mr Robinson, and what did he take back as a pledge? Exactly the estate he had received from Mr Wallace, incumbered with the contracts of sale as it was when he received it; and he could sell no more on his mortgage. A purchaser under the *levari facias*, with notice from the possession of the settlers, would take the legal title of the original proprietor subject to the contracts with which he incumbered it, and subject to the equities with which it was affected when Mr Wallace transferred it by the deed of settlement. How then can the settlers object to an execution of the mortgage, by which the vendee under the judgment is put in the place of the mortgagee? It is said that the substitution of another for Mr Robinson, who is alleged to have been authorised by the terms of his purchase to receive their money, might involve them in a mispayment. I am unable to see that. A payment that would exonerate the land in the hands of the mortgagee, would exonerate it also in the hands of a purchaser under his judgment. But what is the supposed authority of Mr Robinson to receive? Taking his written

declaration to be the act of both parties, it shows but a ratification of the preceding contracts, and an agreement to execute them, which was entirely proper as the legal title was in him as to third persons. But there is nothing so absurd in any part of the agreement as the reservation of an authority that would have converted the real into personal security, and deprived the mortgage of its intended effect.

The root of all the blunders in the cause seems to have been a notion that the settlers have a right to come in as terre-tenants, though they claim paramount the mortgage. The right of a bare occupant to interpose was considered in Chahoon *v.* Hollenback, 16 *Serg. & Rawle* 425, and Clippinger *v.* Miller, 1 *Penns. Rep.* 71, in which the English doctrine that none can be admitted to defend who would not be prejudiced by the judgment, was re-asserted on the foundation of authority and common sense : consequently he who may come in as a terre-tenant must have an estate from the incumbrancer, which might be bound by the incumbrance, whether judgment, mortgage or recognizance. Why must all the terre-tenants be warned ? Simply because they are all bound to contribute to a common burthen. To the mortgage, therefore, the settlers had no defence to make. Not desiring to have the land for nothing, it was indifferent to them whether the legal title were to remain in the mortgagee or to be united to the equity of redemption in the person of a purchaser, as their right under the contract with the original proprietor would be equally available against either. Why then should the judgment have been opened to let them in ? Of payments to Robinson, even conceding that such may have been made, they can have the benefit, at the hearing of their bill, to enjoin the purchaser from proceeding on his judgment in ejectment. Performance of their part of the contract may avail them there, but it cannot prejudice those who stand in the place of the mortgagee here.

But dismissing all further consideration of the error committed in respect to the parties and the substance of the proposed defence, it would be sufficient to show the illegality of the proceeding, that the judgment was opened after the power of the court over it was at an end. It was rendered at November term 1326; and the premises were sold on a *levari facias* to the succeeding term. At November term 1829, the settlers obtained a rule to show cause why the judgment should not be opened and they let into a defence, which was made absolute at the next term, the purchaser having in the interval recovered in ejectment against them on his legal title, which it was their object to destroy. Now it is in vain to say that this was done in the exercise of a judicial discretion which is not a subject of revision here. The day of discretion was past. It is undoubtedly true in the abstract, that the opening of a judgment is not a matter for correction on a writ of error ; but it is also true that for excess of *power* the act may be annulled. This seems to have been recognized in Bailey *v.* Musgrave, 2 *Serg. & Rawle* 220, where an amendment after verdict was held not to be cognizable on writ of error, only

[Catlin v. Robinson.]

because the court had not exceeded its power; and the principle was still more distinctly announced in Huston *v.* Mitchell, 14 *Serg. & Rawle* 310, where the court below had opened a judgment at the term succeeding the verdict. " I shall give no opinion," said the chief justice, with his characteristic caution, " on the power of the common pleas to set aside a verdict and judgment, and order a new trial on a motion not made till the second term after the entry of the judgment. But granting, for the sake of the argument, that they have the *power*, is the order made in this case lawful?" It was held to be unlawful, because it did not amount to a judgment for the defendant, and yet left the plaintiff without the means of proceeding in his suit. Here, then, was an order in the nature of a final judgment, reversed for excess of power in the exercise of a discretionary function. In respect to the power to set aside a judgment on *verdict,* and award a new trial at a subsequent term, when the record had ceased to be in the breast of the court, not to speak of my own recollection of the sentiments of the judges when the cause came up at consultation, it is not difficult to say what ground would have been taken had the cause required it; and I mention this to show that the guarded terms in which the chief justice delivered the opinion of the court were not dictated by any doubt of the principle. I will not say that a judgment by default, or on confession, may not be opened at a succeeding term on the ground of a defence arising *subsequently,* provided it do not interfere with rights acquired under the judgment by third persons; but it must be obvious that it would be attended with extreme danger, if the security of titles founded on judicial proceedings might be invaded by the exercise of an arbitrary and uncontrollable discretion of the courts over their own records. The act imposing a limitation on writs of error would be of little account if an inferior court might do at discretion what the court of the last resort dare not do by an exercise of its legitimate prerogative. Nor would the act to prevent purchasers at sheriff's sales from being dispossessed on reversal of the judgment, afford that perfect protection it was intended to do, if the foundation of the title might be expunged from the record by an act of power. The palpable object of the settlers is to destroy the title which passed to the purchaser under the judgment on the mortgage; and any order or proceeding to produce that effect violates the spirit of the statute. It is considered, therefore, that the order to open the judgment for the plaintiff, and the judgment thereupon rendered for the defendants, be reversed; and that the judgment originally rendered for the plaintiff be affirmed.

Judgment accordingly.