## Cochran *versus* Eldridge.

*Power of court to relieve against inequitable judgment.—Proper mode of relief in such cases.*

| 49 | 365 |
| ·178 | 505 |
| . 49 | 365 |
| 185 | 604 |
| 49 | 365 |
| o202 | 239 |
| 49 | 365 |
| 207 | ²137 |

1. The courts of Pennsylvania have the powers of the Court of Chancery to relieve against inequitable judgments.

2. The usual practice is to open the judgment and let the defendant into a defence on the merits, and on the trial of the issue, the defendant may show fraud in obtaining the judgment.

3. The power extends to judgments on awards of arbitrators, notwithstanding the statutory remedies in cases of compulsory arbitration.

CERTIFICATE from Nisi Prius.

This was a feigned issue awarded by READ, J., at Nisi Prius on a motion to open a certain judgment held by Andrew Cochran against James Eldridge, for the purpose of ascertaining what amount was actually paid or advanced on the securities on which suit was brought by plaintiff either before or after their maturity and to whom; and also whether the award was obtained by fraud or collusion.

Under the ruling of the learned judge at Nisi Prius, the jury found that the sum advanced was only $3300, and that the award for $7834.98 was fraudulent and collusive.

The case was then certified to the court in banc, where the opening of the judgment and the awarding of the issues above mentioned were assigned for error.

All the material facts of the case will be found in the opinion of this court.

*Gilpin* and *McIntyre*, for plaintiff in error.

*George A. Wollaston,* for defendant in error.

[Cochran *v.* Eldridge.]

.The opinion of the court was delivered by

WOODWARD, C. J.—It is necessary to a clear apprehension of the points to be ruled that the material facts of the case be first stated, and this shall be done as briefly as possible.

James Eldridge, a resident of California since 1854, though at intervals between that date and 1863 sojourning temporarily in the cities of New York, Philadelphia, and Washington, was in Philadelphia in the summer of 1856, when he made two promissory notes, payable to the order of E. S. Townsend, for $3000 each, both dated 19th June 1856, and drawn, one at 30 days, the other at 60 days.

On the 14th October 1856, Eldridge made his draft at the city of Washington, in favor of Townsend, for $300.

These three papers, the two notes and the draft, having passed into the hands of Cochran, he brought suit upon them in 1860 against Eldridge, and obtained a personal service of the process. A rule of reference was entered and served, and the hearing before arbitrators was adjourned from time to time from March 1860 to 30th August 1860, when Cochran took an award for $7834.98, the amount of the notes, draft, and interest. Time for appealing was extended by consent of counsel for several periods until December 1860, when the judgment became absolute. In 1862, application was made to my brother Judge Read at Nisi Prius to open the judgment and let the defendant into his defence, and affidavits were exhibited and filed in support of the motion. His Honor, not satisfied from the evidence before him that more than $2500 had been advanced upon the notes and draft, and it appearing to him that very suspicious circumstances attended the award of arbitrators on which judgment was entered for the full amount of the face of this paper and interest, ordered that the judgment be opened and an issue framed to try the following questions :—

1st. What amount was actually paid or advanced on the securities by the plaintiff, either before or after their maturity, and to whom ?

2d. Was the award of arbitrators obtained by fraud or collusion ?

It was also further ordered that the plaintiff or defendant and all other persons, whether interested or not, shall be examined as witnesses by either side.

At a subsequent term of the Nisi Prius, these issues came to trial before me, and from the conflicting testimony of the parties and their respective friends, it appeared pretty evident that Eldridge had placed the notes in Townsend's hands to sell and forward the proceeds to him (Eldridge) at Washington ; that Townsend employed Cochran as his broker to sell the notes in the market, but that

[Cochran v. Eldridge.]

Cochran failed to find a purchaser; that Townsend informed Eldridge that the notes could not be discounted; that Eldridge instructed Townsend to send the notes to him or destroy them, and was afterwards informed by Townsend that they were destroyed; that he returned to California and first heard of the notes in the summer of 1857, and on his return to the East in August of that year, Cochran informed him that he held the notes and draft for advances made to Townsend in dealings between themselves; that he applied to Townsend, who admitted that Cochran held the paper as security for moneys advanced to him, but that he (Eldridge) need give himself no further trouble about the notes, and that he would arrange them with Cochran. Eldridge swore that Cochran never spoke to him subsequently about the notes, though he saw him frequently, but that in passing through Philadelphia in 1860, he was served with process at the suit of Cochran; that he applied to Townsend, who again assured him that he would arrange the matter with Cochran, and that he (Eldridge) need give himself no trouble about the matter, and when he heard subsequently of the reference, he was informed and believed it had for its object the settlement of accounts between Cochran and Townsend which would release his paper. Townsend employed counsel to appear for Eldridge, but never furnished them with any means of defence. Eldridge denied that he ever employed counsel.

Eldridge swore that he owed Townsend nothing, though he admitted dealings which resulted in a balance against Townsend of some $30,000. Townsend, on the other hand, swore that Eldridge owed him money, and that he owed Eldridge nothing.

Cochran claimed to be the creditor of Townsend to a large amount, and that he had bought these notes of him on account of his indebtedness. Townsend, on the other hand, represented himself to have had large transactions with Cochran and his son, but that he had received only some $2500 on account of these notes, and he intended, on final settlement, to repay Cochran his advances, and take up the notes. Cochran swore that he advanced Townsend some $4000 on the notes; that he paid him for the draft, and that after the notes matured he bought them of Townsend for the money advanced.

The first issue ordered by Judge Read was evidently founded on the assumption that Cochran held the notes only as security for moneys advanced to Townsend, and although I felt myself restrained to the issues upon the record and held that the judgment was opened no farther than to try them, yet I submitted to the jury the question whether Cochran were a *bonâ fide* purchaser for value, because it seemed to me that whilst that question was not raised upon the record, it would, if found in Cochran's favor,

displace both the questions that were raised. The jury were fully instructed that if he were such holder, it was no matter at what sum he purchased the paper, and there was no fraud in taking judgment for the full amount of it.

But if, as the first issue assumed, he held the paper only as his security for advances, it would be necessary to fix the amount of those advances ; and on this point all the evidence was referred to the jury.

Then as to the question of fraud, the jury were instructed that if Cochran, well knowing that he had advanced less than half the face of the notes, and that he held them merely as security for his advances, went before arbitrators, and, in the absence of the defendant and his counsel, took an award for the full amount of the notes and interest, it was evidence from which they might infer the fraudulent intent.

The jury found that the notes and draft were deposited with Cochran by E. S. Townsend to be sold for the benefit of Eldridge ; that they were not sold, but that Cochran advanced and paid Townsend $2300 on the faith and credit of said securities.

They found, also, that the award for $7834.98 was fraudulent and collusive.

No judgment was entered upon the verdict, but the prothonotary was ordered to enter judgment for Cochran for the amount of the verdict, not in the issues tried, but in the case of Cochran *v.* Eldridge, where the judgment was opened ; the usual costs to be taxed on that record for the plaintiff, except the costs of the arbitration, which Cochran was ordered to pay.

Such was the disposition made of the case at Nisi Prius.

On appeal to this court, the principal points of assault were the orders of Judge Read in opening the judgment, and the submission of the question of fraud on the trial of the issues. It was stoutly denied that the judge had power to open a judgment obtained in an adversary proceeding after service of process, even for fraud, but if it should be held that he had, it was next denied that there was any evidence of fraudulent intent or practice to justify either the opening of the judgment or the submission of the question to a jury.

The power to relieve against judgments at law, when fraudulently obtained or where some strong natural equity can be alleged against them, has been long recognised in English jurisprudence, and by many writers has been likened to that of the Roman Prætor, whose jurisdiction undoubtedly had its origin in the application of equity as contradistinguished from mere law. It was one of the first subjects that engaged the attention of the English chancellors, and, though violently resisted by common-law lawyers and judges, the power was largely exercised by Cardinal Wolsey in the reign of Henry VIII., and, according to Mr. Reeves,

[Cochran v. Eldridge.]

with great ability and justice.   It is related of Sir Thomas More,
who succeeded Cardinal Wolsey, that, having invited the judges
to dine with him, he showed them the number and nature of the
causes in which he had granted injunctions to judgments of the
courts of common law ; and the judges, upon full debate of the
matters, confessed that they could have done no otherwise them-
selves.    Still, however, clamors against the equity jurisdiction
continued, until they culminated in the famous controversy in the
reign of James I., which was conducted principally by Lord Coke
against, and by Lord Ellesmere in favor of, the chancery juris-
diction.    The very point of this controversy, according to Judge
Story (1 Story's Equity, § 51), was whether a court of equity
could give relief for or against a judgment at common law, and
it was finally decided in favor of the equity jurisdiction.    From
that time down to this day the jurisdiction has been exercised in
England, and decrees of ecclesiastical courts have often been
relieved against on the ground of fraud : Van Brough v. Cock, 1
Chancery Cases 201; Bissel v. Axtell, 2 Vernon 47.    And so
in like manner have awards (Lord Lonsdale v. Littledale, 2 Ves.
451) and verdicts (Williams v. Lee, 3 Atk. 223 ; Bateman v. Wil-
loe, 1 Scho. & Lef. 201) and judgments at law (Barnsley v. Pow-
ell, 1 Ves. Sen. 119 ; Gainsborough v. Gifford, 2 P. Wms. 424 ;
Humphreys v. Humphreys, 3 P. Wms. 394).    And even decrees
in chancery may be avoided for the same cause : Loyd v. Man-
sell, 2 P. Wms. 73 ; Galley v. Baker, Cases Temp. Talbot 201 ;
Bradish v. Gee, Amb. 229.    In the above-cited case from 2 P.
Wms., at page 246, the Master of the Rolls said such cases there
are in which equity will relieve after a verdict in a matter where
the defendant at law might properly have defended himself, as if
plaintiff recovers a debt and defendant finds a receipt for the
money recovered.    In Humphreys v. Humphreys, 3 P. Wms.
394, a son had sued his father at law on a bond, and recovered
a judgment, against which an injunction was granted in chancery.

I do not think it necessary to encumber the page with a citation
of the more modern English decisions.    For American authorities
I refer to Pickett v. Steward, 1 Rand. 478, where an executor
was relieved from a judgment recovered against him ; Skipwith
v. Struther, 3 Rand. 214 ; and Gill v. Webb's Admr., 4 Monro
299, where it was held that a court of equity has jurisdiction to
relieve against a judgment founded on a gaming debt, although
the party failed to defend himself at law and gave no good rea-
son for such failure.    Relief will be granted in equity on the
ground of concealment of material facts by a party, in conse-
quence of which he recovered at law: Fish v. Lane, 2 Hayw.
342.    In accordance with this principle, Chief Justice Marshall
said, in Sims v. Slocum, 3 Cranch 307, when the person who has

13 Wr.—24

[Cochran *v.* Eldridge.]

committed the fraud attempts to avail himself of the act, so as to discharge himself from a previously existing obligation, or to acquire a benefit, the judgment thus obtained is declared void as to that purpose. See also Reigel *v.* Wood, 1 Johns. Ch. Rep. 402 ; Shattenkirk *v.* Wheeler, 3 Johns. Ch. Rep. 275 ; De Reimer *v.* De Cantillon, 4 Id. 85 ; Van Meeter *v.* Jones, 2 Green's (N. J.) Ch. Rep. 520.

Whether the principles of these cases be applied by courts of chancery as an independent jurisdiction or by courts of law exer‧cising equity powers, is a matter of no significance. The material point is that such principles do pervade our jurisprudence, and it is well they do, for they are only the dictates of natural justice and common sense. That wholesome maxim of the common law, that fraud vitiates whatever it touches, makes no exception of judgments at law. No court of justice will set aside or even be led to look into a solemn judgment on light or trivial grounds ; but when it is alleged upon adequate proofs that a judgment in whole or in part has been obtained by a suppression of truth which it was the duty of the party to disclose or by the suggestion of a falsehood or by any of the infinite and therefore undefinable means by which fraud may be practised, no court will allow itself, its records, and the process of law to be used as instruments of fraud. It seemed to be thought, on the argument, that the judgment in this case, being founded upon an award of arbitrators, could be im- peached only by proceeding under the Acts of Assembly regu- lating compulsory arbitrations, but the principle lies deeper than the form of the proceedings ; it goes to the very root of the evil when it deprives him of all benefit of his iniquity who has fraudu- lently employed legal process and judicial records to obtain an undue advantage over another.

Opening judgments entered upon warrant of attorney, and by confession, has been largely practised in Pennsylvania. Some- times a collateral issue has been directed to try disputed facts, sometimes execution-process has been controlled to promote the equity due to parties, but our favorite practice, and that which Ch. J. Gibson commended in Gallup *v.* Reynolds, 8 Watts 425, has been to open the judgment without impairing its lien, and let the defendant in to defend upon the matters alleged in his affidavit of complaint. Our practice, said the Chief Justice in that case, is to try collusion by a collateral issue, but matter of defence by an issue in the cause. In Kellogg *v.* Krauser, 14 S. & R. 143, Ch. J. Tilghman declared in 1826, that the practice of opening judgments entered on warrant of attorney, or of ordering a feigned issue, to ascertain necessary facts, had been undisputed for half a century, at least. In Kalbach *v.* Fisher, 1 Rawle 323, a judgment had been entered in the Common Pleas of Berks county in 1820, upon warrant of attorney ; a *scire facias* to revive it

[Cochran *v.* Eldridge.]

and judgment thereon in 1825; and in 1827 a rule was obtained to open both the original judgment and that upon the *scire facias,* which was made absolute, and a trial had in 1828, which resulted in a verdict for the defendant. In delivering the opinion of the Supreme Court, that no writ of error would lie to the opening of a judgment by the court below, Mr. Justice Rogers said: "The power of the Court of Common Pleas, in relation to opening judgments, is most ample, and policy requires that it should be liberally used, otherwise great and manifest injustice would be the consequence, from the great variety of shapes which fraud may assume in the complicated transactions of men. It depends upon the sound discretion of the court, which must be regulated more by the particular circumstances of every case, than by any precise and known rule of law. In Huston *v.* Mitchell, 14 S. & R. 307, it was ruled, that the Court of Common Pleas had no right to set aside a judgment entered upon a verdict without setting aside the verdict also. See also Dickerson's Appeal, 7 Barr 257; Banning *v.* Taylor, 12 Harris 291; Stiles *v.* Bradford, 4 Rawle 401.

In most of these cases it will be seen that, whilst the power of opening judgments to let defendants in upon the merits has been vindicated, it has been assumed that either in that form, or by framing a collateral issue, fraud in obtaining the judgment may be shown; and if shown that it will kill the judgment. Creditors have often been admitted, to show that a judgment was fraudulent as between the original parties, and it would be strange if the defrauded party might not show the fraud.

The doubt expressed in Mather's Executors *v.* Patterson, 9 Casey 487, not whether a court has power to overhaul a judgment for fraud, but whether the report of the auditors in that case was properly remitted to them after a final judgment, has no reference to the subject under consideration. Nor have the observations that were made in Catlin *v.* Robinson, 2 Watts 379, and in Stephens *v.* Cowan, 6 Id. 513. Doubtless, the discretion of the court in listening to a plea of fraud will be influenced by the lapse of time, and a chance once had, though not improved, for a fair trial; but both of these considerations were overlooked in the above-cited case of Kalbach *v.* Fisher, and would be again if necessary to correct a palpable fraud.

These authorities are sufficient to show that our courts have always possessed, and in one form or another exercised the chancery power of relieving against fraudulent judgments, however obtained, and that Judge Read did not transcend his just powers when he opened the judgment and framed the issues in this case. On the question whether the evidence justified the finding of the fraud, we had so much doubt as to stimulate us to a careful considera-

tion of the testimony, and the result of our reflections is that the question was properly submitted.

That Mr. Eldridge was badly cheated by his agent Townsend seems to us quite probable, but we see no satisfactory evidence that Cochran was in combination with Townsend to cheat Eldridge. Still, however, Cochran knew how he held the paper of Eldridge, and, as the fact is now established by the verdict, that he held it only as a security for his advances to Townsend, Cochran must be considered as knowing that he was entitled to receive on that paper no more than these advances. We cannot treat him as a *bonâ fide* purchaser of the paper, for the jury found that he was not. Then he was a mere pledgee, and he must have known himself to be nothing more. It was argued that he would be responsible to Townsend for the full amount of the paper, and therefore was bound to demand the full amount from Eldridge. But he could, in no event, have been liable to Townsend, for Townsend never owned the paper, nor had any interest in it. All parties proved that it was placed in Cochran's hands to be sold for Eldridge's use, and was not sold, but was retained by Cochran as security for his advances to Townsend. Now the inference is large enough that Cochran made these advances to Townsend in good faith and upon the credit of this paper, without pressing it so far as to make it an ordinary business transaction in which Cochran would stand as a purchaser of the paper from Townsend. Had he been such a purchaser, there would have been a reason for his taking an award for the full sum of the paper, for there might have been a liability over to Townsend; or, if none, it would have been because he had extinguished Townsend's interest and held the paper as his own, and, of course, for all it expressed. But Townsend had no interest in the paper, and could call Cochran to no account by reason of it. The paper was made by Eldridge for his own use, and having permitted Cochran to make advances on the faith of it, he is bound to reimburse him, though no dollar of Cochran's advances ever reached his hands; but beyond this he was under no duty to Cochran, and Cochran knew that this was the extent of his liability.

Cochran knew also that Eldridge was absent in California, that he had repudiated this paper altogether, and that Townsend and not Eldridge was attending to the arbitration. He was probably aware of the fact also that Townsend had led Eldridge to believe that the object of the arbitration was to settle the dealings between themselves, Cochran and Townsend, and he certainly knew that Townsend was managing the arbitration, for he received a consideration from him for adjournments and extensions of the right of appeal.

Now, under these circumstances, to demand and take an award against Eldridge for $7834.98, when the jury could not find that

[Cochran v. Eldridge.]

he had advanced more than $2300, was, in their judgment, ill faith and fraudulent. The verdict does exact justice to Cochran, supposing him a pledgee and not a *bonâ fide* purchaser of the paper, for it compels Eldridge to repay every dollar his agent received from Cochran on the credit of the paper he issued, but it prevents his using legal process, the award and judgment, to inflict the great wrong upon Eldridge of making him pay nearly six thousand dollars which he never received and which Cochran never advanced. We think there was enough in the case to justify the submission, and as substantial justice was obtained we will affirm the judgment and proceedings.

                                   Proceedings affirmed.