## Commonwealth ex rel. Clancy v. Myers

*Raymond R. Start*, District Attorney, and *R. Paul Sand*, Assistant District Attorney, for Commonwealth.

*George H. Class, George S. Sauliner* and *Herbert L. Maris*, for relator.

DIGGINS, J., August 20, 1956.—This matter arose by reason of the fact that the United States Attorney for the Eastern District of Pennsylvania, W. Wilson White, while investigating and prosecuting a crime in

the Federal jurisdiction, discovered that there was a man serving a prison term in Pennsylvania for a crime which it now appears he did not commit, which fact launched an investigation in Pennsylvana under the direction of Herbert L. Maris, of the Philadelphia bar, assisted by George H. Class and George S. Sauliner, of the Delaware County bar, with the full coöperation of the Federal prosecutor and operatives.

The record shows that one Joseph Clancy was arrested in Delaware County in January of 1952 charged by W. Harvey Smock, of the Upper Darby National Bank, with a series of frauds on the bank involving cheating by false pretenses and forgery. Defendant was held for court, subsequently indicted on six bills of indictment, one of which charged cheating by false pretenses and five of which charged forgery. Defendant vehemently and consistently denied his guilt.

The case was called for trial in Delaware County on June 19, 1952. The evidence discloses that someone, alleged to be defendant, Clancy, opened an account in the Haverford Township Branch of the Upper Darby National Bank in the name of Franz J. Saylor with an initial deposit of $25 in cash and thereafter, through a fraudulent use of this account and the standing it gave him in the bank, obtained money on checks allegedly stolen from the mails and endorsements forged on some four different occasions during a two weeks' period following the opening of the account on January 31, 1952.

The bank clerk who conducted the business of opening the account testified that although of course she saw the party who opened the account in the name of Franz J. Saylor, she could not identify defendant as being that person. However, another woman employe of the bank, the savings and miscellaneous teller, said that certain checks were deposited in the account on February 4, 1952, by one posing as Franz J. Saylor

and she unequivocally swore that the endorsements on the checks were the signature of the man at the window known as Franz J. Saylor and she positively identified defendant, Joseph Clancy, as the person who represented himself to be Franz J. Saylor, and she said she saw defendant sign the name "Franz J. Saylor" on the back of at least one of the checks. She also testified that on the same day, February 4, 1952, the same man, posing as Franz J. Saylor, presented a withdrawal slip for $305 in the account which was paid on the faith of the uncollected checks. She also testified as to being present when other transactions in the account were made by defendant, Clancy, posing as Saylor.

The checks, being forgeries, led to the discovery of the fraud by the bank. This witness was taken by postal inspectors to the United States Post Office at 30th and Walnut Streets, Philadelphia, and there, at the inspector's office, she was interviewed and described the man known as Saylor. The following day she was shown a photograph by a Federal government operator and she identified the photograph as that of the man who posed as Saylor and later she picked defendant out of a group of three men as being Franz J. Saylor.

Evidence also was introduced to show that checks had been stolen by someone and the signatures forged. The conviction, however, rested entirely upon the positive identification of the woman clerk.

Defendant, denying his guilt vehemently, said that he was at the time employed as the night manager of a hotel in Philadelphia and knew nothing whatever of the transaction and denied in toto every allegation of the Commonwealth. He worked at night but he accounted, as best he could, for the time on the days when the offenses were committed. He testified vehemently that he had never been in the Haverford Township

Branch of the Upper Darby National Bank and did not know where it was and he insisted that the witness was mistaken in her identification.

When he was asked if he knew any reason why this witness might mistakenly identify him, he suggested that perhaps she had been influenced by United States Government Inspectors whom he named and who were very active in this prosecution and pointed out that because these particular inspectors knew that he, defendant, had been guilty of passing worthless checks before, had selected him as the guilty party in the present case. There is no doubt that these particular operators had done just that, perhaps with understandable error, because it is true that he had been in jail some 26 years, nearly all of his adult life, for this type of offense, which defendant readily admitted. This past history defendant himself introduced and admitted in the testimony and blamed it on the fact that the offenses would occur when he was drinking and under the drive to obtain funds for alcohol.

At the conclusion of his cross-examination, he was permitted by the court to make a statement in which statement he said that he had been trying to rehabilitate himself since he got out of prison in 1951 principally because he said that he knew his conduct had caused his mother's recent death. He pleaded that all he asked of society was a chance to maintain himself by honest work. He called upon God Almighty as his witness that he was innocent of these charges.

Records of prior convictions were introduced but the trial judge carefully warned the jury that such evidence was not to be used in determining the guilt of defendant but merely to attack his credibility. It is significant to note that in the prior records introduced, defendant had pleaded guilty to the offenses.

The trial judge carefully charged the jury on all significant matters, with particular emphasis on

credibility of witnesses, and gave special attention to the question of identity as involved in the case, and told the jury that they must consider that evidence with great caution, and called the attention of the jury to the denial and the alibi evidence of defendant and its legal significance. The jury convicted defendant on all counts.

At the time of sentence, when the trial judge was reviewing defendant's record, he readily admitted that and contended he was ashamed of it, but insisted he was not the man, Saylor, in this case. The court sentenced on the various indictments a total of five years minimum and 15 years maximum. When these sentences were passed, defendant said: "As Almighty God is my judge, I have never done this. I know I have to answer for my soul sooner or later." It appears now that this unfortunate defendant was telling the truth.

While it must be admitted on the one hand that the prior record of this defendant made this case exceptionally vulnerable to the error, both that made by the private detective and that made by the witness, and no one can criticize the judge, the jury or the Commonwealth's officer for this mistake, nevertheless some five years' imprisonment for a crime never committed is shocking.

When the investigation of the circumstances of this conviction and the probabilities of the error were reduced to a certainty by those concerned, the matter of the procedure to correct the error was undertaken. Inexplicably, much confusion and difference of opinion among learned and responsible lawyers and courts on this procedure exists in Pennsylvania. Nowhere in the records can there be found a detailed treatise on the subject nor any case which outlines the full procedure.

In the instant case, all members of the district attorney's office agreed that the facts now alleged warranted immediate steps to correct the error. Generally,

however, the district attorney's staff insisted the procedure was not by writ of error coram nobis but none could suggest the proper writ.

Because of the exigencies of this case and the apparent merit in the application, we undertook an immediate study of the proper procedure and after exhaustive research concluded that without a doubt a writ of error coram nobis could and should immediately issue. Whereupon, a proper petition having been prepared and filed, the writ of error coram nobis was allowed by the court and issued by the clerk, requiring the presence of defendant before the court for hearing.

At the hearing, evidence was adduced in support of the petition from most responsible sources, thoroughly competent and most convincing. Two able and experienced United States Postal Inspectors, Robert H. Studenberg and John Speers, testified that since this fraud involved purloining United States Government checks from the mails, the matter was in their hands and that they, following accepted procedure, examined their files for individuals using similar modus operandi and came up with defendant. Subsequent investigation revealed his presence in the area with full opportunity to have committed the offense and with other individuals and alone, he was presented to the bank teller, Mrs. McIlrath, who without equivocation identified him as being the person who had committed the fraud.

These same two men, for the record, pointed out the physical similarities between relator and Huber, stating that at that time, more than four years ago, the similarity was even more pronounced. They explained the fact that in searching their files for suspects, they did not run across Huber because at that time Huber had never been in the Federal toils and they had no file on him. This explains how the finger of suspicion pointed toward Clancy.

It is significant to note that Mr. Speers says that even at the time he had some doubts because Clancy had been such an experienced operator in this field that he could not believe that he would have committed such a clumsy offense, but in face of similarity in form, the positive identification, as well as the fact that he knew that Clancy was an alcoholic, finally overcame his doubts and he felt the evidence more than sufficient at the time.

Following the conviction then, nothing further of interest happened until another crime was committed and the same postal inspectors were called in and they were surprised and interested to find that the forged alias was Franz J. Saylor. This struck a responsive chord in their memories and led to a comparison with the records in relator's case and a strong suspicion that Huber was the man guilty in both instances.

Armed with this, they caused handwriting comparisons to be made by experts, etc., checked the whereabouts of Huber at the time and became convinced that Huber was the man. Indeed, it turned out that Huber at the time of the Upper Darby Bank fraud had been living in Lansdowne in the same block where Mr. Speers was living. They confronted Huber with this information without telling him that another man was in jail for the crime and he readily admitted it and signed a statement to that effect.

This set in motion the wheels in relator's case. The United States Attorney, W. Wilson White, interested himself in the matter. Raymond R. Start, District Attorney of Delaware County and Paul Sand, Assistant District Attorney, cooperated, as did the postal inspectors, the prison authorities, the United States Commissioner of Prisons, as well as Herbert L. Maris, of the Philadelphia Bar, George H. Class and George S. Sauliner, of this bar.

Also at the hearing, Mr. Stangohr, an expert on questionable documents and handwriting assigned to the postal department, testified that he had examined the instruments used in defrauding the Upper Darby National Bank, he had examined the known handwriting of Clancy and Huber, and that he was conclusively of the opinion that Clancy had not committed the forgeries. He was reasonably convinced that Huber had, but said that Huber had so well disguised his handwriting in making the forgeries that he would not say with full assurance that Huber had so done. However, Huber himself was called to the stand. He was shown photostatic copies of all the forged and fraudulent instruments and records and though having been warned of his constitutional rights and what might happen to him, unequivocally said that he had done the writing, that he had presented to the bank the said instruments, that he had obtained the funds alone and used them solely for his own purposes, that he had never seen nor heard of relator, Clancy, until now. If there was any infirmity in the testimony of the handwriting expert, and we do not believe there was, it was cured by this testimony.

Mrs. McIlrath was called. She was the teller who identified relator at the time of his trial and supplied the indispensable evidence to support his conviction. She first testified at this hearing that now, having seen Huber, she was not sure which one of the men presented the instruments to her, but went further and said that if these two men had been presented to her at the time of the trial, she would not then have sworn under oath that Clancy was the man.

At the conclusion of this evidence, the court discharged defendant from further custody.

Because of the lack of a complete record of procedure in coram nobis, we felt that a detailed opinion in this case should be written and recorded.

The questions raised when the matter arose and those which will arise in similar cases are as follows:

1. Does the trial court have jurisdiction to issue the writ of error coram nobis and if so, what division of the trial court, and is the right affected by the expiration of the term time?

2. Under what circumstances alone will the writ issue?

3. Does the writ issue initially or is it to be preceded by a rule?

4. What must the original petition aver?

5. What is the form of the writ of error coram nobis?

6. Necessity for hearing and degree of proof?

7. Final action thereon.

1. Does the trial court have jurisdiction to issue the writ of error coram nobis and if so, what division of the trial court, and is the right affected by the expiration of the term time?

The term "coram nobis" means "before us", originally the King, i.e., In the King's or Queen's Bench, also known as "writ of error coram nobis". It was a common law writ, the purpose of which was to correct a judgment in the same court in which it was rendered on the ground of error of fact, in cases where the statute provides no other remedy, and where the facts do not appear of record or were unknown to the court when judgment was pronounced and which, if known, would have prevented the judgment, and which were unknown and could not have been known to the party by the exercise of reasonable diligence in time to have been otherwise presented to the court unless he was prevented from so presenting them by duress, fear or other sufficient cause.

At common law in England, it issued from the Court of King's Bench to a judgment of that court. Its prin-

cipal aim is to afford the court in which an action was tried an opportunity to correct its own record with reference to a vital fact not known when the judgment was entered. It differed from the writ of error coram vobis only in the respect that such a writ issued under the same circumstances from the Court of King's Bench to a judgment of court of common pleas.

The question then arises: "Does the Supreme Court of Pennsylvania have exclusive jurisdiction in matters of this kind and should the petition be directed to that court, and if in the judgment of that court, a prima facie error is made out, it then either issues coram nobis and corrects the error itself, or issues coram vobis directing the trial court to correct the error?"

We are of the opinion that all courts of record in Pennsylvania have jurisdiction to issue the writ of coram nobis, perhaps only the Supreme Court can issue the writ of coram vobis, although we do not here so decide. We reach the conclusion that courts of record have the right even though it was apparently anciently the prerogative of the Court of King's or Queen's Bench to which our Supreme Court is analogous: (a) Because it is a common law writ; (b) Because in most instances, and particularly in this instance, action upon the writ requires the taking of testimony, a function not normally discharged by our Supreme Court, and (c) Because in a number of cases right down to the present time, our appellate courts have acted upon the merits of cases where the writ of coram nobis had been issued by the trial court without ever questioning the right of the trial court to have issued the writ.

We therefore believe it to be the settled law in Pennsylvania that while no doubt the Supreme Court of Pennsylvania has original jurisdiction of the writ, it is not exclusive, and the trial courts of record share the jurisdiction.

A reading of the Habeas Corpus Act of February 18, 1785, 2 Sm. L. 275, as amended, 12 PS §1871, et seq., confirms that it was neither intended to nor did it cover a situation such as we have here, nor do the Rules of Civil Procedure. Historically, however, that writ is designed to secure the release of one held in custody, whether it be in prison or any other institution, or in a private home by a private individual, where the legal right of such custodian to hold relator is challenged, not in situations where relator is held after judgment and sentence by due process of law.

Neither the writ of coram nobis nor that of habeas corpus is a substitute for an appeal. Each has a distinct well-known and highly important function and under these circumstances it is the writ of coram nobis.

Indeed the Act of May 25, 1951, P. L. 415, having to do with habeas corpus, provides for the use of this writ by one alleged to be unlawfully imprisoned or detained. Here no one alleges relator to be unlawfully detained. It is admitted that due process was had, but asserts an error in that process and judgment.

The question of what division of the trial court has jurisdiction of the writ presents no particular problem. What confusion there is arises by reason of the fact that the writ of habeas corpus issued to relieve individuals from custody is said to be a civil remedy and issues out of common pleas court even though affecting individuals held in jails. This probably arises by reason of the fact that habeas corpus has other functions than that of releasing prisoners on bail or otherwise, and as a matter of fact, in some counties in Pennsylvania, notably Philadelphia, a writ of habeas corpus, when it affects prisoners, does issue out of the court of quarter sessions.

We are of the opinion that a writ of error coram nobis under these circumstances is a function of the

court of quarter sessions and in practically all of the cases in Pennsylvania, it was in quarter sessions.

The issuance of this writ, far from being precluded because the term time in which the judgment of conviction was entered had passed, is the key which unlocks the door to the long past term. If the term were not passed, the error could be corrected by the granting of a new trial, etc. If the writ did not unlock the door to the past term, it would be useless and in every case in which the writ was recognized and used in Pennsylvania, the action came after term time and never once was the discharge refused because the writ was issued after the term had passed, and indeed the equitable powers of the court alone would be sufficient: Commonwealth ex rel. v. Ashe, 28 D. & C. 573; King v. Brooks, 72 Pa. 363; Cochran v. Eldridge, 49 Pa. 365, and also in Commonwealth v. Pfeiffer, 46 D. & C. 275, 278, Judge Crumlish specifically held that the writ would issue after term time.

In the foregoing cases and in others, i.e., Commonwealth v. Valerino, 32 D. & C. 363, the court, Brown, J., said:

"The writ of coram nobis is still available in this State to bring before the court rendering a judgment matters of fact which, if known at the time judgment was rendered, would have prevented its rendition: it may be resorted to in a criminal case where no other form of judicial relief exists, as where the term at which sentence was imposed has expired." (Syllabus.) See also, Commonwealth v. Pfeiffer, supra, and most recently, the Superior Court, in a per curiam opinion, Commonwealth v. Ondrejcak, 181 Pa. Superior Ct. 102, confirmed the foregoing rule.

True it is, in the majority of these cases, after hearing, relator, rather than being discharged, was remanded, but this was because either the writ was improvidently issued in the first instance, or the proof

on the hearing failed to meet the test. All of them stand for the rule that this court has jurisdiction in the premises.

2. Under what circumstances alone will the writ issue?

It will be noted that in defining the writ of error coram nobis, a number of circumstances necessary to justify the issuance of the writ are discussed. These reasons have been recognized since earliest times in various States in the United States and in Pennsylvania, and they have been elaborated on, but they stand today clearly defined and they are listed as follows:

a. There must be no statute providing a remedy. (There is a statute in Pennsylvania providing remedies in murder cases.)

The legislature, as early as 1903, recognized the foregoing condition and in the case of first degree murder, provided a statute governing the procedure in correcting exactly this kind of an error in first degree murder cases only. That act, April 22, 1903, P. L. 245, 19 PS §861, provides that whenever such a situation as this appears in a first degree murder case, a petition is to be filed with the Supreme Court, and if supported by the evidence, new trial is to be had, notwithstanding the expiration of the term, so that the writ of coram nobis no longer will lie to correct error of fact in first degree murder cases because a statute in such situations has replaced the writ.

b. There must be alleged facts which did not appear of record, unknown to the court when judgment was pronounced, and which if known would have prevented the judgment, and could not have been known to the party by the exercise of reasonable diligence in time to have been otherwise presented to the court unless he was prevented from so presenting them by duress, fear or other sufficient cause.

c. Allegations that at the time of the trial, defendant had a valid defense which without negligence on his part was not made because although he denied his guilt, he was not then able to prove who committed the crime for which he was sentenced.

d. The granting or the refusal of the writ is always in the sound judicial discretion of the court, which discretion is reviewable by the appellate court (but is probably interlocutory until final action taken on the writ).

It would seem to us that only in cases where the original petition for the writ meets these exacting tests should the writ issue and having issued, proof to the hilt should be adduced before the accused is discharged, otherwise great mischief might ensue.

Confession by another alone should not be sufficient because it could be procured after the statute has run against the late confessor to effect the release of the prisoner without harm to the confessor.

Recantation of material witness should not be sufficient because pressure or inducement might too readily be brought and care must be taken by the trial court before issuing the writ to discourage its frivolous use by prisoners in the hands of themselves or "stir" lawyers. In this field, the abuse of the habeas corpus writ is giving the courts no end of difficulty. No further avenues should be opened.

All of the authorities include some of the foregoing circumstances which will alone support the issuance of the writ: Commonwealth v. Pfeiffer, supra; Commonwealth v. Ashe, supra; Troubat & Haly, Vol. II, 6th ed., page 1214; Ernst v. State, 181 Wis. 155, 193 N. W. 978; Black's Law Dictionary, fourth ed., pages 406 and 1785; Commonwealth v. Ondrejcak, supra.

3. Does the writ issue initially or is it to be preceded by a rule?

It was urged upon us that the writ should be preceded by a rule to show cause. We rejected this theory because that would, inter alia, change the function of this writ. Under such a procedure, testimony would be taken upon the rule and then either the rule discharged or, if made absolute, the writ of coram nobis would issue as a warrant of discharge to the warden of the prison. It is not such a writ. It is in this respect exactly the same as a writ of habeas corpus. Where that writ is applicable, we issue it and then we either remand or discharge by further order. So it should be with coram nobis.

4. What must the original petition aver?

For the reasons discussed supra, we are of the opinion that a petition presented praying for the writ of error coram nobis should contain allegations averring practically all of the circumstances outlined herein. True, not all of them will be available in otherwise meritorious cases, but sufficient of them must be required which, if proven, would make improbable abuse of the writ or fraud on the court and the State.

In the present case, the petition avers confession by another, statements of a handwriting expert that petitioner did not and that the late confessor did execute the instruments, recantation of the identifying witness. True, it is not represented in this petition that the witness now recants to the extent of saying that petitioner is not the man and the late confessor is, but goes only so far in regard to this averment to say that the witness now says she does not know which one. In our opinion, since it would require more positive evidence than that originally, it amounts for all practical legal purposes to a recantation. The petition further avers the presence of the late confessor in the the area at the time the crimes were committed and averments of the late confessor.

5. What is the form of the writ of error coram nobis?

This question was raised by us when the petition was presented. Like ourselves, none of the interested lawyers had ever seen the writ. An extensive study of the cases, the text-books and the form books failed to disclose the form of the writ. Everybody talks of it just as though we all knew just exactly what it looked like. We searched records of cases where the writ was used but its form does not appear in the records although the name frequently appears. We learned that one enterprising clerk in the State, being confronted with this situation, took a writ of habeas corpus and scratched out the title and wrote "coram nobis". His ingenuity is to be commended—it worked; but we think the writ is entitled to its own distinctive form and we therefore devised a form of the writ of error coram nobis, a copy of which is attached to this opinion for reference by those who may be interested.

6. Necessity for hearing and degree of proof?

From what has been said supra, it would seem to us that little more needs to be said under this heading.

The hearing is necessary because all of the allegations must be proved to prevent abuse and the rules of evidence regarding the degree of proof should be strictly adhered to, that is to say, that the late confessor should be brought into court as a witness as was done here, even though he had to be brought all the way from Georgia; The Federal Bureau of Prisons in Washington cooperated fully. There may be situations where affidavits of such a person taken together with many other uncontrovertible facts would be sufficient or there may be situations where the taking of depositions may be had, but hearsay evidence of responsible officers that the new confession was made to them should not be substituted for the proper evidence, and all other witnesses, recanting or otherwise, should be called in support of the writ.

If the allegations are fully proved, proper action should follow. If they fail in any material particular, the prisoner should be remanded under the original sentence.

7. Final action thereon.

It will be apparent now that the final action is merely for the court to prepare an order, if the evidence warrants, opening the judgment of conviction, revoking the sentence and discharging the prisoner, which order shall be sufficient warrant to authorize the warden or other custodian to release petitioner, the action regarding the judgment itself being necessary to expunge the record which is the prisoner's right, or otherwise to merely make an order remanding the prisoner.

There is some discussion as to whether or not where certain new facts are proved at the hearing, they should not be resubmitted to a jury by way of a new trial. It would appear to us that this action should never follow the writ of coram nobis. If the allegations which are necessary to the issuance of the writ of coram nobis are alleged and proved, then they must a fortiori present a case which had it been presented originally would have prevented the judgment of conviction, would have moved the court to direct a verdict. If they fail in this, either the writ should not have been granted in the first place or the prisoner should be remanded, and the writ should never issue unless the new facts averred *would*, not might, have forced the trial judge to direct acquittal in the first instance.

As we said at the conclusion of the hearing and we here repeat, in this case a man served four and one-half years for a crime which he did not commit. This was a tragic error indeed, but as a short review of the facts will disclose, this unfortunate circumstance certainly is no indictment of the jury system, nor can any criticism be levelled at any individual concerned

with the original prosecution. Here was a man who had spent 26 of the previous 29 years in jail for exactly this type of crime. He was in the area; his work schedule permitted him to be at the bank at the times when the frauds occurred. He was pointed out as a suspect by the postal inspector's department, a standard and effective police procedure properly followed then and now. He was positively identified by the bank teller. His alibi, through no fault of his own, was poor. His long record of similar crimes was before the jury to attack his credibility. The trial judge was particularly fair throughout. He warned the jury regarding the limited use of the evidence of past bad record. He admonished the jury about the fallibility of positive identification. He properly pointed out the proper application of alibi evidence. Indeed the trial judge meticulously protected every right of defendant. However, the jury convicted Clancy. In our opinion, any honest jury would have done likewise. We said publicly at the conclusion of the hearing and we repeat that Mrs. McIlrath need have no deepseated feeling of having done an injustice. She bore only the same responsibility in the trial that every other individual, the government operators, the district attorney's office, the jury and the judge, bore, and the burden of this honest and understandable mistake must be shared equally by all.

We therefore make the following

### Order

And now, to wit, this August 20, 1956, a writ of coram nobis having heretofore issued and the matter coming on for hearing, the testimony having been taken and it appearing that relator, Joseph Clancy, was not guilty of the crimes for which he was convicted, we order and direct that the judgment be and the same is hereby opened, the sentence is set aside and relator is discharged.

[*FORM*]

DELAWARE COUNTY, SS:

CORAM NOBIS

THE COMONWEALTH OF PENNSYLVANIA

To David N. Myers, Warden, Eastern State Penitentiary, Graterford, Pennsylvania,

GREETING:

We command you that the body of

JOSEPH CLANCY, E 3067,

under your custody detained, you have before the Honorable John V. Diggins, Judge of the Court of Quarter Sessions at Media, Delaware County, Pennsylvania, on the 22nd day of August, 1956, then and there to do and be subject to whatsoever said judge shall consider in that behalf. And have you then and there this writ.

Witness the Honorable John V. Diggins, Judge of the Court of Quarter Sessions at Media, Delaware County, Pennsylvania, this 3rd day of August, one thousand nine hundred and fifty-six (A. D. 1956).

WILLIAM H. MILLIKEN, JR.,
Clerk of Courts