## Andrews's Adoption.

*William Carney,* for petitioners; *C. Victor Johnson,* contra.

CLARK, P. J., Dec. 9, 1929.—Oct. 8, 1928, a petition was presented to the court for the adoption of a minor female child by James F. McGrath and Mary C. McGrath, his wife. Oct. 22, 1928, at 10 o'clock A. M., was set for a hearing and testimony was then taken.

The court was not satisfied with the evidence and desired further information as to who the parents of the child to be adopted were, whether they had been notified of the hearing, and had given their consent to the adoption, or whether all the requirements of the statutes had been *bona fide* complied with.

The petitioner and counsel were accordingly notified that further testimony must be taken. It was promised but not carried out, for what reason we do not know—it may have been forgotten or deemed unnecessary.

The case was officially unnoticed for several months, a year lacking a few days. Some time in the month of September, 1929, the mother of the child appeared in chambers and wanted to know if a child known as Phyllas A.

Andrews had been adopted. She was referred to the office of the clerk of the Orphans' Court; after some research she learned that proceedings were pending for the adoption but there had not been any decree made. Subsequently, the father and mother, Samuel E. and Thelma Raucci, ascertained who had the custody of the child, employed counsel and they filed an answer to the petition, objecting to the adoption as prayed for.

The petition sets forth, *inter alia*, that the petitioners are residents of Erie, Erie County, Pa.; that the child was born at Corry, Erie County, Pa., Sept. 27, 1928; that the child is unmarried, has no estate and is named in the petition as Phyllis A. Andrews, and

"7. That said Phyllis A. Andrews is the child of Thelma Andrews and its male parent is unknown, that the residence of Thelma Andrews is the City of Corry, County of Erie and State of Pennsylvania."

"9. That hereto annexed are consents to adoption given by Thelma Andrews, the mother of the illegitimate child."

Attached to the petition is the following alleged blanket consent:

"I, the undersigned, unmarried, being the sole known parent of Phyllas A. Andrews, a female child, born September 27, 1928, in the City of Corry, Erie County, Pennsylvania, do hereby certify that the name of the father of the said minor has been withheld from the petitioners hereinbefore named; that the father has refused to acknowledge said minor as his child; and that I am willing and desirous that said minor be adopted as prayed for in the foregoing petition, and for this purpose I do consent thereto, hereby ratifying and confirming the adoption of the said minor, specifically waiving any and all notices or citation whatsoever.

"Witness:                      "THELMA ANDREWS.

"Dr. A. G. REES

"State of Pennsylvania, County of Erie.

"On this 3 day of October, before me, G. H. Gordon, an alderman in and for said County and State, residing in the City of Corry, Pennsylvania, personally appeared the above named Thelma Andrews to me known to be the person who signed the foregoing release, who in due form of law acknowledged the same to be her act and deed, and desired that it might be recorded as such.

"Witness my hand and official seal the day and year aforesaid.

"G. H. GORDON, Alderman."

It will be noticed that the alderman's *jurat* gives the date Oct. 3 without stating the year.

The answer alleges that Samuel Raucci and Thelma Ross were married May 12, 1928; that there was born to them in lawful wedlock a daughter, Phyllas Aileen Raucci at the Home Maternity Hospital in Corry, Pa., Sept. 27, 1928; that the mother, Thelma Raucci, was an inmate of the hospital two months prior to the birth of her daughter and for some time afterwards; "that while she gave her name to Dr. A. G. Rees, Superintendent of said Home, as being Thelma Andrews and represented to him that she was unmarried, he, the said Dr. A. G. Rees, knew and was advised by her that her maiden name was Thelma Ross, and he also knew her father and mother to be Mr. and Mrs. S. W. Ross and he knew that they all resided in Meadville, Crawford County, Pa.;" that Oct. 3, 1928, their child was delivered to the petitioners; that neither of the natural parents knew who had their child until Oct. 13, 1929; that they did not know the petitioners; that the natural parents did not give their consent to the adoption of their child; that neither of them had any notice of the presentation of the petition for adoption; that the father, Samuel

W. Raucci, furnished $339.50 to A. G. Rees, the superintendent, for the care of the mother and the child while in his hospital; that, though the alleged "consent" contains the following: "That I am willing and desirous that said minor be adopted as prayed for in the foregoing petition and for this purpose I do consent thereto," etc.; no such petition was presented to the mother; that it did not exist Oct. 3, 1928, the day this blanket consent was alleged to have been given; that by this "consent a fraud was perpetrated upon the court," etc.; that when the consent was signed the mother was an infant under the age of twenty-one years and could not lawfully make an agreement for the adoption of her child; that the parents desire to have the child in their own home; and that the court is without jurisdiction in this matter because the petitioners have not complied with the law, as follows:

"A. There is no consent of either the father or the mother of the child for the adoption prayed for.

"B. The paper purporting to have been signed, acknowledged and delivered by the mother of the said child on Oct. 3, 1928, is not a consent to the adoption prayed for and can in no way abridge the requirement of the act of assembly for such consent in order to give the court jurisdiction to decree an adoption.

"C. There is no allegation in the petition for adoption of said child that either or both of the parents of said child have been adjudged a lunatic or habitual drunkard or that either or both of them had abandoned their said child.

"D. The adoption petition does not set forth correctly the names of the natural parents of said child nor the true name of the child proposed to be adopted."

Oct. 31, 1929, was set for a hearing. Counsel for petitioners being engaged in another court on that day, the case was continued to Nov. 7, 1929, when testimony was taken and completed.

The findings of fact are as follows:

Thelma Ross was married to Samuel E. Raucci, May 12, 1928; they are living at Meadville, Crawford County, Pennsylvania. The child whose adoption is under consideration was born to them in lawful wedlock, Sept. 27, 1928, at the Home Maternity Hospital in the City of Corry, Pennsylvania. The hospital is patronized mostly for the birth of illegitimate children, and Dr. A. G. Rees conducts the business—is the superintendent or owner—he testifies that he is "the head of" this institution, that this child is the one for whom the adoption proceedings were commenced, and it was taken away from the hospital Oct. 3, 1928, [and] delivered by Dr. Rees to James F. McGrath and Mary C. McGrath, his wife, who went to the hospital in response to an advertisement of a child for adoption. They are the petitioners for the adoption of the child. When they received her they paid Dr. Rees $15 and he gave to Mr. McGrath a paper purporting to be a "consent" of the mother of the child for its adoption. This paper, heretofore mentioned, is a "blanket consent," was not accompanied by any other papers, and it was made to attach to any petition, no matter who might be named as petitioners.

In the instant case, the petition for adoption was not in existence when this "blanket consent" was executed, yet it contains a statement of a willingness to have the child "adopted as prayed for in the foregoing petition." It further avers that "the name of the father of the said minor has been withheld from the petitioners hereinbefore named" (there were not any petitioners when the consent was signed), and, further, that the "father has refused to

acknowledge said minor as his child;" yet he visited the hospital and paid the expenses of the confinement, $339.50.

The mother testifies, when this "blanket consent" was presented to her, that "Dr. A. G. Rees told me it would be better if I should take a different name so it would not cause any unpleasantness when anything would be looked up," and then she signed Thelma Andrews.

The petition alleges that the child proposed to be adopted is illegitimate—it is not—and the "blanket consent" is signed by Thelma Andrews as the mother, whereas her married name is Thelma Raucci. She was eighteen years of age when the consent was signed—she was known at the hospital as Thelma Ross.

She gave her name as Thelma Ross and introduced her parents as Mr. and Mrs. S. W. Ross. She received from Dr. A. G. Rees the following receipt:

"Oct. 'th, 1928.
"Received from Mr. S. W. Ross payment in full of all acct. for Thelma Ross.                                           "HOME MATERNITY HOSP.
                                                  "Dr. A. G. Rees, Supt."

Catherine Cassler testified that she was a nurse and had been employed at the hospital eighteen months prior and up to Nov. 2, 1929, and knew the mother as Thelma Ross, that she was so known by other people and nurses there, and that she knew her after she was married by the name of Raucci, but not till after she entered the hospital.

Effie Mae Mackin, a nurse at the hospital before the child was born, and now, was asked: "Do you know Thelma Ross Raucci, and answered, 'Yes; heard her name as Thelma Ross, never knew her by the name Andrews. She never told me whether she was married or not.'"

The parents, Mr. and Mrs. S. W. Ross, lived at Meadville, Pa., visited the hospital and were known to Dr. A. G. Rees, who talked with them several times, as Thelma's parents. The father of the child also visited the hospital. The father and mother of the child did not have any notice of the presentation of the petition for adoption. They both thought their child was legally adopted at or near the time it was taken away from the hospital. Shortly thereafter both regretted separation from their child; the mother suffered a nervous breakdown grieving for her child. She came to Erie, Pa., Sept. 28, 1929, trying to ascertain the whereabouts of her child and whether it had been adopted or proceedings were pending. On Sept. 30, 1929, she visited the hospital in Corry, Pa., and begged Dr. A. G. Rees to tell her "the name of the people who had taken my baby," and he said "he was not allowed to tell." The mother and father visited Erie, Pa., Oct. 13, 1929, learned who had their child, and, as a result, filed in court, Oct. 13, 1929, their answer to the petition for adoption. They have a home in Meadville and the father has regular employment at $160 per month, and sometimes in addition, as a musician playing in an orchestra. The parents are financially able to care for their child and are respectable and of good repute.

The mother was admitted to the hospital July 29, 1928, and left Oct. 6, 1928. The child was taken away Oct. 3, 1928, before the mother got out of bed. She is a Protestant in her religious faith; the faith of her husband is not disclosed in the testimony.

The first hearing in the adoption proceedings was Oct. 22, 1928. James F. McGrath and Mary C. McGrath, his wife, have three children of their own, aged eleven, nine and seven years; they do not own their home, but lease No. 518 Holland Street, Erie, Pa., and are of Catholic faith. Mr. McGrath,

on being asked by counsel if he could find the mother, answered: "I presume so, I can get in touch with Dr. Rees, of Corry."

The reason for the mother's action may in part be gathered from her testimony. She was asked her purpose in saying and doing what she did, and answered: "The early birth to the marriage. We were married in May, it was born in September. We did not have any home, I lived with my mother and father and he lived with his parents, and we did not have any money, that was all."

To correct as far as possible their indiscretion, they were secretly married and concluded it was best to create the impression that there was no marriage and that the child was illegitimate, and possibly it might be better to have the child adopted. If so, both the mother and father repented of this conclusion and sought to reclaim the child, prompted by natural feelings of affection.

The mother's judgment immediately after the birth of the child, still suffering from the pains of her confinement, may not have been of the best or in accord with her wishes after she had fully recovered.

There was an attempt on the part of the hospital authorities to cover up the exact truth, to conceal something and not to let the public know what had happened, and that was carried into court, and what was done comes very close to the perpetration of a fraud.

Dr. Rees testified that "Mr. McGrath said he didn't want an Italian child. I told Mr. McGrath it was of American extraction [the father is Italian];" that he could not remember what name the mother gave when she came to the hospital ("we do not refer to the girls' last names when they are there"); that he did not advise the McGraths where the mother or her parents lived; that he does not take the names of the parents or their daughters who come to the hospital; and yet he testified that he talked with the mother about her marriage. The first name of the child is spelled Phyllis in the petition and Phyllas in the answer and elsewhere.

The authorities or management of the Home Maternity Hospital at Corry, Pa., have been acting under the assumption that the "consent" attached to the petition in the case at bar is a sufficient consent—is the legal consent of the natural parent.

Dr. A. G. Rees, testifying, says: "I have regular forms made for New York, Pennsylvania and Ohio—regular forms made according to the statute. When they want their child adopted, they give me a right to let the child go when they sign this permit." "Q. Those forms you speak of are typewritten or printed? A. Typewritten; my lawyer put them up for me." The present counsel is not that lawyer.

The necessity for a proper legal consent in adoption proceedings has been judicially decided in several cases.

In Vandermis v. Gilbert, 10 Pa. Superior Ct. 570, it appears that a consenting parent died one day before the petition for adoption was presented. It was held that this was a fatal defect, and there was no consent. Facts alleged in a petition are supposed to be made as of the date when the petition is presented.

The petition must be accurate in every respect.

In Petition of William Mockieviz, 22 Schuyl. Legal Rec. 350, the spelling of the names of the petitioner and of the mother of the child were not uniform in the petition and the signatures; hence, the court could not determine the exact name of the petitioner or of the child. The consent of the mother was not attested. The syllabus, in part, is as follows: "The consent of the

parent of the child to be adopted should appear of record in legal form. It is better practice to have all parties in interest appear before the Court." This case was decided Oct. 11, 1926.

In Petition of Clarence Sinton et al., 24 Schuyl. Legal Rec. 23, decided Jan. 9, 1928, by the same court, [through] Wilhelm, P. J., the infant whose adoption was sought "was in the custody of the Veil Hospital, Langhorne, Pa., or Veil Maternity Hospital, and it advertised the infant for adoption." In the consent of the mother attached to the petition, the mother says, "I am willing and desirous that said minor be adopted as prayed for in the foregoing petition," and this statement appears to have been made under oath Sept. 3, 1927. The statement of the petitioners appears to have been made on Dec. 14, 1927, clearly showing that the petition was not complete at the time the mother signed her assent.

The case at bar is the same. That part of the consent quoted above by the court is precisely like that found in the present "blanket consent."

Proceedings were commenced before us some time ago wherein a "consent," containing the same sentence, was given and signed by Charles M. James, who alleged that he was the Superintendent of the Veil Hospital, Corry, Pennsylvania, and with this there was also a "blanket consent" signed by the mother of the child, identical with the one in the instant case excepting names and dates. In the case then before us it was brought to the attention of the court that C. M. James, the Superintendent of the Veil Maternity Hospital at Corry, Pa., had "discontinued the hospital there and lived in Langhorne, Pa., and was the Superintendent of the Veil Maternity Hospital at Langhorne, Pennsylvania."

The defective consent forms used by Superintendent James at Corry, Pa., were used by him in Langhorne, Pa., and declared defective in the case last cited. These forms were utilized at Corry, Pa., by the present management, and one of these consent forms is attached to the McGrath petition. This form does not meet the requirements of the law, and the alleged consent is invalid.

In Booth v. Van Allen, 7 Phila. 401, "A decree of adoption under the Act of May 4, 1855, will be revoked when it appears to the court that it was obtained by fraud and misrepresentation" is the first syllabus. The court said: "This petition is so framed as to lead to the belief that the infant was an unfortunate child whose father was unknown, whose mother had abandoned it and that there was no one interested in the application except the petitioner and no one to whom notice could be given. . . ."

"In default of parents, it is essential there should be consent by a next friend or guardian of the poor," etc. "A guardian of the poor or charitable institution can only be allowed to consent to a decree of adoption after they shall have supported the child one year," this under the law as it then was. The decree of adoption was there revoked.

"Under the Act of May 19, 1887, P. L. 125, the court is without jurisdiction to enter a decree of adoption unless consent of the next friend or guardian of the child appears of record." Decree of adoption entered May 3, 1904, revoked. The record there did not show the consent of next friend or guardian—there was a rule pending to show cause why this should not be amended, and it was held that the court was without jurisdiction to make the order because of failure of the record to show this consent: Luccareni's Adoption, 13 Dist. R. 782.

A petition was filed for the adoption of a child of divorced parents, and alleged the mother gave consent and that the father had neglected or refused

to provide for the child for a year prior to filing the petition. The father had not been notified of the petition for adoption, and it was never advertised.

A decree was made, a petition to revoke was filed, and a rule was entered to show cause why the adoption decree should not be revoked. The court reopened the proceedings, a full hearing was had upon the petition and the answer, the father and mother appearing, and the decree was sustained; but the court held that an adoption decree should not be awarded without a judicial determination whether the father had neglected or refused to provide for the child for one year as provided by law. "There is no requirement in the statutes or in the rules of court on this subject for notice to the non-neglecting parent." In that case the husband's address was known to the wife, for she secured personal service on him in her divorce proceedings.

The Act of May 28, 1915, P. L. 580, was followed in these adoption proceedings: Kelly's Adoption, 6 D. & C. 506.

The kind of consent necessary under the Act of May 12, 1887, was decided by Judge Lindsey, Oct. 24, 1921, in Letchock's Adoption, 1 D. & C. 223.

In that case the child to be adopted was born May 5, 1920, and the petition averred that the mother relinquished her right to the child and committed it to the Children's Home Society of Pennsylvania and consented that it might be adopted by such person or persons as the home might designate. To the petition was attached the following so-called consent: "Know all men by these presents, that Margaret Letchock, of Stockton, Pa., being the mother of Florence Letchock, a child aged three weeks, born May 5, 1920, do hereby relinquish all my right to the said child to the care and custody of the Children's Home Society of Pennsylvania and do hereby consent that the said child may be legally adopted by such person or persons as may be chosen by the said Children's Home Society of Pennsylvania without any further notice to the undersigned. Done at Hazleton, Pa., this 26th day of May, 1920."

The court held that:

"It seems too clear for any argument that the paper purporting to be signed by Margaret Letchock, if designed to divest her of her status or rights as a parent, is illegal and void for such purpose as against public policy," and, further, that,

"The consent of the parents must be their consent to the particular adoption prayed for, and must be presently given at the time of hearing the petition by the court," and Vandermis v. Gilbert, 10 Pa. Superior Ct. 570, and, also, Keeler's Adoption, 52 Pa. Superior Ct. 516, were cited in support.

In the case of Revocation of Adoption by Thomas H. Sleep, 6 Dist. R. 256, the mother entered into a formal written agreement with the Children's Home Society (chartered as The American Educational Aid Association) to place her child in its custody, and consented that it might "be legally adopted by such person or persons as may be chosen by said [Society] without further notice to the undersigned."

A rule was entered by the court of its own motion to show cause why the order of adoption should not be revoked, and it was done.

The court says:

"And it would seem, from his testimony and from the facts in this case, that it is considered a part of the humanitarian and philanthropic business of the society, for the alleged good of the child, and especially for the satisfaction of the adopting parents, that the actual parent shall not have intercourse with the child, and, in fact, shall not know where the child is; and a part of the plan shown by the adoption papers in this case is to destroy the identity

of the child so that the mother shall not know where the child is or the child shall not know who the mother is, and the adopting parents shall not know the parentage of the child. . . .

"This plan of undertaking to destroy the identity of the child, to hide it from its mother and hide its mother and parentage from it, is, in our judgment, contrary to sound public policy, directly tending to encourage illegitimacy; is a wrong to the child itself, because those who have the education and training of the child should know its parentage and the peculiarities it inherited. It seems to us that it is so contrary to public policy as to make the alleged contract entered into in this case between the mother and Mr. Thompson void. It ignores her affection for her child, the respect that a child should have for the parent. It is so contrary to all our preconceived notions of a true public policy, of morality, of humanity, and of Christianity, that it is shocking to us that any persons who believe in the Bible, or who have any regard for parental affection, should adopt such a plan."

In Denny's Adoption, 11 D. & C. 611, the court says:

"Many cases have been cited as to what will amount to an abandonment by counsel both for petitioners and respondent, but a summing up of all of these cases brings the court to the conclusion that every finding must depend on the particular facts as shown in the case before the court."

An apparent abandonment "certainly forms a more reasonable ground for permitting judicial discretion to decide whether another may assume these claims and duties than the signature of the parent, which a mere impulse may induce. It does not follow that the purpose may not be repented of, and in proper cases all parental rights again acquired, including this statutory right of preventing adoption by withholding consent; but, when once the abandonment is shown to have existed, it becomes a judicial question whether it really has been terminated or can be consistently with the welfare of the child."

In Keeler's Adoption, 21 Dist. R. 1106, the mother had surrendered her child to "the Sisters of Charity, Seventieth Street and Woodland Avenue," and agreed not to interfere "with any one to whom the Sisters may hereafter confide the said child for adoption," in a paper signed in September, 1909.

The mother regretted doing this and notified the institution and one James T. Sweeney, who petitioned to adopt the child April 23, 1910. After signing the paper, the mother "was persuaded to abstain from taking any steps towards the reclamation of the child until after the birth of another expected child, which was born in March, 1910. The child for adoption was illegitimate and was born July 30, 1908, at the St. Vincent's Home and Maternity Hospital.

Aug. 12, 1908, the mother left the home and the child in care of that institution. In April, 1909, she took it away and returned it July 28, 1909, and bade it good-bye and then on that day the institution passed the child to James T. Sweeney, the petitioner, under probation with a view to ultimate adoption.

In the proceedings, "this institution was treated as the quasi-parent who had notice."

A decree of adoption had been made April 23, 1910, and there was an averment of illegitimacy and abandonment. The court held that the real state of the facts was not made known. The executed agreement between the mother and the institution or the Sisters of Charity wherein she consented to an adoption was not sufficient to give the court jurisdiction, the mother had not in law consented and the decree was revoked as having been procured by misrepresentation or concealment of the facts.

Section 4 of the Act of April 4, 1925, P. L. 127, provides that the court must be "satisfied that the statements made in the petition are true," etc.

Keeler's Adoption, *supra,* was appealed and was reviewed by the appellate court in Keeler's Adoption, 52 Pa. Superior Ct. 516. It will be remembered that there was a signed agreement by the mother for the institution that she would consent to and not oppose an adoption by any one designated by it.

That was not her lawful consent. The court held:

"With the positive knowledge that the mother did not consent to the adoption of her child by any person and was at the time in correspondence with the St. Vincent Home requesting permission to repossess it, the petition in this was presented and the decree secured, without the court being informed of the actual and vital facts of the case. The motive prompting this action was undoubtedly a good one, but the rights of the mother are superior to that of a stranger, and her consent was necessary before such a decree can be held valid. The petitioner evidently so regarded it. It may be well that the court was not designedly imposed on by the petitioner, and he took a chance on the subsequent ratification by the mother. However, the petitioner suppressed a fact, which if known by the court would have prevented the decree, and he is not now in position to complain of a decree which would have been entered had the whole truth been exhibited at the time it was entered. No court of justice will set aside or even be led to look into a solemn judgment on light or trivial ground; but when it is alleged upon adequate proofs that a judgment, in whole or in part, has been obtained by a suppression of truth, which it was the duty of the party to disclose, or by the suggestion of a falsehood or by any of the infinite and, therefore, indefinable means by which fraud may be practiced, no court will allow itself, its records and the process of law to be used as instruments of fraud: Cochran *v.* Eldridge, 49 Pa. 365. While there is no suggestion of designed or actual fraud, as such, in this case, it was clearly a legal fraud on the court to suppress the jurisdictional facts, and for that reason the decree was invalid, and the same court had ample authority to vacate the decree it had erroneously entered: Fisher *v.* Railway Co., 185 Pa. 602."

Adoption proceedings are statutory and the statutes must be strictly complied with. Adoptions are among the most important functions of the court. The transferring of a person from the environment of his birth by reason of which there are created certain reciprocal duties, rights and obligations, parental and filial, into new surroundings and relationships requires intelligent consideration; parental ties are ordinarily stronger than those of a stranger, the welfare of the child is to be sought and the laws of inheritance are affected.

A maternity hospital may be not only a convenience for indiscreet and unfortunate girls, but it should not be conducted to encourage illegitimacy, but as a helpful asylum for ministering to the frailties of erring persons in a lawful way.

The evidence offered on behalf of the petitioners is not clear and convincing, the statements in the petition are not true, the alleged consent of the mother attached to the petition is not valid; it is an attempt to give a consent by proxy which the law does not permit and the courts have rejected; the pleadings and procedure must be correct, the requirements of the act observed and the testimony full, complete and in support of the allegations alleged in the petition, the court should be informed of conditions past and present, to the end that the child to be adopted, the adopting persons, the natural parents and the community may be protected in their several rights and for the welfare of all.

In No. 12 of protestants' answer there are four paragraphs marked A, B, C and D, giving reasons why a decree of adoption should not be made; they are sustained.

And now, to wit, Dec. 9, 1929, the petition is dismissed, costs of proceedings to be paid by petitioners and protestants, each to bear one-half of same.

From Otto Herbst, Erie, Pa.