# Commonwealth *ex rel.* McLaughlin *versus* Cluley.

1. Quo warranto is not a writ of right.

2. Statute 9 Anne, ch. 20, was not at first adopted in this state, but its provisions were incorporated into our revised code.

3. The enactment that writs of quo warranto may be issued on the suggestion of any person desiring to prosecute the same, means any person having an interest to be affected.

4. Where at an election for sheriff a majority of the votes are cast for a disqualified person, the next in vote is not to be returned as elected.

5. The suggestion alleged that at an election for sheriff the person returned was disqualified. The candidate next in vote had no such interest as entitled him to be heard in a quo warranto. The question was exclusively a public one, and could be raised only by the attorney-general.

November 11th 1867. Before THOMPSON, STRONG, READ and AGNEW, JJ. WOODWARD, C. J., absent.

This was a rule in the Supreme Court, No. 147, to October and November Term 1867, on the suggestion of J. Y. McLaughlin, to show cause why a quo warranto should not issue against Samuel B. Cluley to answer by what warrant he held and exercised the office of sheriff of Allegheny county.

The suggestion set out that at the general election October 9 1866, Cluley received 19,915 votes for the office of sheriff, and McLaughlin received 12,925 votes for the same office; that Cluley was commissioned on the 12th day of November 1866, notwithstanding he had been commissioned for the same office on the 28th of August 1863, and had discharged its duties until the first Monday of December 1863, and could not lawfully be commissioned as sheriff of the same county twice in six years; that being in violation of article 6, section 1, of the Constitution of Pennsylvania.

*J. K. Kerr, R. B. Roberts and W. H. Lowrie,* for the relator, submitted the following propositions:

1. Is a county such a municipal corporation as is mentioned in the British statute, 9 Anne, ch. 20, and the Pennsylvania statute of 14th June 1836?

2. Is a sheriff a county officer within the meaning of the Act of 1836?

3. Does article 6, section 1, Constitution of Pennsylvania, create in the respondent a disability to hold and exercise the office of sheriff?

[Commonwealth v. Cluley.]

4. Has J. Y. McLaughlin such an interest in the matter to be inquired into as to entitle him to sue for the writ of quo warranto ?

5. Will he succeed to the office in case of judgment of ouster against the respondent ?

6. Will the court, in the exercise of its discretion, refuse the writ to a relator, situated as is J. Y. McLaughlin ?

They cited upon the first : Stat. 9 Anne cap. 20, § 4; Roberts' Dig. 386 ; Acts April 15th 1834, § 1, Pamph. L. 537 ; June 14th 1836, § 2, Pamph. L. 621, Purd. 202, pl. 1, 832, pl. 2.

Upon the second and third : Constitution of Pennsylvania 1776, 1790, 1838, Art. 6, sec. 1, Purd. 20 ; Commonwealth v. Leib, 9 Watts 220.

Upon the fourth and fifth : 4 Cowen 100, 3 Steph. N. P. 2434, 2435 ; Rex v. Godwin, Douglass 385 ; Commonwealth v. Brown, 1 S. & R. 382 ; Commonwealth v. Jones, 2 Jones 365 ; Commonwealth v. Small, 2 Casey 31; Act of April 13th 1840, § 13, Pamph. L. 323, Purd. 834, pl. 19 ; Commonwealth v. Burrell, 7 Barr 34.

Upon the sixth : 4 Cow. 102 ; Rex v. Latham, 3 Burrows 1485 ; s. c. 1 W. Black. 468 ; Rex v. Carter, Cowper 58 ; Rex v. Godwin, Douglass 385 ; King v. Mayor of Bedford, 8 Mod. 35 ; King v. John, Id. 132 ; King v. Powell, Id. 165 ; King v. Penryn, Id. 216 ; King v. Smith, 3 T. R. 573 ; King v. Morris, 3 East 213.

*T. M. Marshall* and *J. Veech*, for respondent.

The opinion of the court was delivered, January 7th 1867, by

STRONG, J.—A writ of quo warranto is not a writ of right. Even our Act of Assembly of June 14th 1836, recognises this. It enacts that such writ *may* be issued by the Supreme Court in all cases in which the writ of quo warranto at common law may have been issued, and in which the said court had, before the passage of the act, possessed the power of granting informations in the nature of such writ. The British statute of 9th Ann. ch. 20, was not, at first, adopted in this state. It was not reported in force by the judges ; but its provisions were incorporated into our revised code. Under the British statute it was always held to be within the discretion of the court whether to grant or withhold an information in the nature of a quo warranto, and the court acknowledged themselves bound to exercise a sound discretion upon consideration of the particular circumstances of each case. This was said by Lord Mansfield in Rex v. Wardroper, 4 Burr 1964, and the same rule was recognised in Rex v. Dawes, 4 Burr 2022, and in Rex v. Sargeant, 5 Term Rep. 467, and there are cases in which courts have refused leave to file an information at the suggestion of a private relator, even when a valid objection to the defendant's title has been shown : Rex v. Parry, 6 Ad. & E. 810 ; 2 N. & P. 414. Nor has this court since the Act of

[Commonwealth *v.* Cluley.]

1836, adopted any other rule. In Commonwealth *v.* Jones, 12 Penn. St. Rep. 365, the British practice was recognised as the rule with us, and though it has since been decided that it is not indispensable a rule to show cause should be obtained before the writ can issue, no decision has been made that this court is obliged to entertain such writ, if in their opinion it was improvidently issued. The issue of the writ does not end the discretion of the court.

Before the Act of 1836, informations in the nature of quo warranto, at the instance of a private relator, were always required to be with leave of the court, and leave was not granted except upon application of a competent relator. No one was held competent who had not a sufficient interest to warrant his interference, and our statute has made no change in this particular. Its second section gives to courts of Common Pleas concurrent jurisdiction with the Supreme Court in five classes of cases. The first three relate to municipal and other corporate offices, and the act provided that in any such case the writ might be issued upon the suggestion of the attorney-general or his deputy in the respective county, or of any person or persons desiring to prosecute the same. The other two classes relate to usurpations of corporate rights, or forfeitures of corporate privileges. As the act was reported by the commissioners to revise the civil code, it was drawn so as to provide that writs in such cases should be granted only upon the suggestion of the attorney-general, or his deputy. The legislature, however, altered the provision, and enacted that writs in these cases, as in the others, might be issued upon the suggestion of any person or persons desiring to prosecute the same. But the statute of 9th Anne allowed informations at the relation of any person desiring to sue or prosecute them, and under that statute the rule was that a private relator must have an interest. Our act, which substantially incorporates the provision of the British statute, has received the same construction. This court has construed the words " any person or persons desiring to prosecute the same" to mean any person who has an interest to be affected. They do not give a private relator the writ in a case of public right, involving no individual grievance. This was ruled in Commonwealth *v.* The Allegheny Bridge Company, 8 Harris 185, in Murphy *v.* The Farmers' Bank, Ibid. 415, and Commonwealth *v.* Railroad Company, Ibid. 518. And it is to be observed that the legislature has placed all the five classes of cases enumerated in the act on the same footing in this particular. If a private relator cannot sue out a writ to enforce a forfeiture without having an interest, the statute gives him no greater right when he complains of usurpation of a county or township office. The right of a relator in each class of cases is defined by the same words.

[Commonwealth *v.* Cluley.]

The relator in the present case suggests that Samuel B. Cluley now usurps, intrudes into and unlawfully holds the office of high sheriff of Allegheny county; that at the general election on the 9th day of October 1866, an election was held for sheriff of said county, that at the election the said Cluley received nineteen thousand nine hundred and fifteen votes, and the relator received twelve thousand nine hundred and twenty-five votes for the said office; that the vote was certified to the governor, and that Cluley was commissioned sheriff, and that he has since acted as such notwithstanding the fact that he was commissioned sheriff of said county on the 28th of August 1863, and discharged the duties of the office from that time until the first Monday of December 1863.

Now, on this showing, what interest has the relator in the question he attempts to raise? What more than any inhabitant of Allegheny county, or of the Commonwealth? He was a rival candidate at the election for the office, but he was defeated, with a majority against him of six thousand nine hundred and ninety. Doubtless, if his successful rival is incapable of holding the office on account of the constitutional provision " that no person shall be twice chosen or appointed sheriff in any term of six years," or for any other reason, and that incapacity entitles him, the relator, to the office, he has an interest. He certainly can have none if a judgment of ouster against Cluley would not give the sheriffalty to him. But surely it cannot be maintained that in any possible contingency the office can be given to him. The votes cast at an election for a person who is disqualified from holding an office are not nullities. They cannot be rejected by the inspectors, or thrown out of the count by the return judges. The disqualified person is a person still, and every vote thrown for him is formal. Even in England it has been held that votes for a disqualified person are not lost or thrown away so as to justify the presiding officers in returning as elected another candidate having a less number of votes, and if they do so a quo warranto information will be granted against the person so declared to be elected, on his accepting the office. See Cole on Quo Warranto Informations, 141–2; Regina *v.* Hiorns, 7 Ad. & E. 960; 3 Nev. & Perry 184; Rex *v.* Bridge, 1 M. & S. 76. Under institutions such as ours are, there is even greater reason for holding that a minority candidate is not entitled to the office if he who received the largest number of votes is disqualified. We are not informed that there has been any decision strictly judicial upon the subject, but in our legislative bodies the question has been determined. It was determined against a minority candidate in the legislature of Kentucky, in a case in which Mr. Clay made an elaborate report, and was sustained. In 1793 Albert Gallatin, elected a senator from this state, was declared by the Senate of the United States disqualified because he had not been a citizen of the United

6 P. F. Smith—18

[Commonwealth *v.* Cluley.]

States nine years, and his election was declared void for that reason, but the seat was not given to his competitor. Nobody supposed the minority candidate was elected. There have been several other cases of contested elections in which the successful candidates were decided to have been disqualified, and denied their offices. John Bailey's case is one of them. He was elected to Congress from Massachusetts, and refused his seat in 1824. But neither in his case, nor in any other with which we are acquainted, were the votes given to the successful candidate treated as nullities, so as to entitle one who had received a less number of votes to the office. There is a class of cases in England apparently, but not really, asserting otherwise. The earliest of them are referred to by Mr. Buller in his argument in Rex *v.* Monday, Cowper 530. They were followed by Rex *v.* Hawkins, 10 East 211, and Rex *v.* Parry, 14 Id. 549. In these cases it is said that if sufficient notice is given of a candidate's disqualification, and notice that votes given for him will be thrown away, votes subsequently cast for him are lost, and another candidate may be returned as elected if he has a majority of good votes after those so lost are deducted. There is more reason for this in England, where the vote is vivâ voce, and the elective franchise belongs to but few, than here, where the vote is by ballot, and the franchise well nigh universal. In those cases the notice was brought home to almost every voter, and the number of electors was never greater than three hundred, and generally not more than two dozen. Besides, a man who votes for a person with knowledge that the person is incompetent to hold the office, and that his vote cannot therefore be effective, that it will be thrown away, may very properly be considered as intending to vote a blank, or throw away his vote.

But the present relator suggests no such case. He does not even aver that, if the votes given for Cluley were thrown out, he received a majority, though doubtless such was the truth. He has therefore exhibited no such interest as entitled him to be heard.

On the argument we were told that in Rex *v.* Godwin, Douglas 387 (396), it was held that the rival candidate was the most proper relator. An examination of the case, however, shows this to be a mistake. The rival candidate was the relator, but he received a majority of the votes. Doubtless in England, when the information is against a burgess or alderman of a borough, a corporator is held a fit relator. He has an interest. Our case of Commonwealth *v.* Small, 2 Casey 31, cited in support of the suggestion, instead of being any real support, is adverse to it. The relator was, it is true, a rival candidate, but his suggestion was not supported for that reason, but because there had been a subsequent election at which he had been elected. The court put his

[Commonwealth *v.* Cluley.]

right to intervene expressly on the ground of that subsequent election. Said Lowrie, J.: "The relator shows sufficient evidence of title in himself to authorize him to institute this proceeding. He acquired it at a subsequent election, and if that is not contested on any other grounds than the supposed validity of the prior election, then, of course, he is entitled to the office." The plain inference from this is, that had it not been for the second election, he would have been an incompetent relator.

It need only be said in regard to the Act of April 13th 1840, that the relator referred to in it is a person entitled to the office, if judgment be given against the party in possession.

After what has been said, it will be seen that we are of opinion J. Y. McLaughlin has no such interest as entitles him to be heard in a writ of quo warranto. The question which he seeks to raise is a public one exclusively, and it can be raised only at the instance of the attorney-general.

The writ of quo warranto is denied.

THOMPSON, C. J., dissented, and delivered the following opinion:—

The suggestion filed in this case avers the disqualification of the respondent to hold the office of sheriff of Allegheny county, to which he claims to have been elected in 1866, in this: that his commission pursuant to that election was the second to him for the office of sheriff within six years, and therefore violative of the 6th article, sect. 1, of the Constitution of the Commonwealth, which, among other things, declares, that "no person shall be twice chosen or appointed sheriff in any term of six years." Disqualification being an incapacity to hold the office is undoubtedly a ground of ouster, and consequently the suggestion is sufficient in law to be replied unto: Rex *v.* Mayor of Bedford, 8 Mod. 35; Rex *v.* John, Id. 132; and Rex *v.* Powell, Id. 165.

The truth of this averment was not controverted on the argument; nor that, within the meaning of the Constitution, the defendant had been twice chosen or appointed inside of the prohibited period, to the office of sheriff. The objection was, that the relator had shown no such interest in the question attempted to be raised, as would entitle him to file the suggestion and call for the defendant's warrant for exercising the office.

It was not much insisted on that the office of sheriff is not a county office. This was incapable of denial; it has always been so. The name or title "sheriff" is said to be derived from the Saxon word "seyre," a shire, or county, and "reeve," "bailiff," or "keeper;" the seyre-reeve, sheriff or bailiff of a county.

The Constitution, in article 6, makes it a county office by providing that "Sheriffs and coroners shall be chosen by the citizens

[Commonwealth *v.* Cluley.]

of each county ;" and the Act of 1834 relating to counties and townships, and county and township officers, classes it with county offices. His duties, in the absence of special authority, are confined to the county in which he is chosen or appointed. A private relator is, therefore, competent to file the suggestion, and raise the question of the validity of the defendant's commission. The Quo Warranto Act of 1836 provides that "the suggestion in such a case may be filed by any person or persons desiring to prosecute the same." The practice has been uniform that a county office is within this provision. I do not deem it necessary to cite authorities for this, especially as the great question is in regard to the interest necessary to be shown in the relator, which virtually concedes this point.

In The Commonwealth *ex rel.* Clark *v.* Read, 2 Ashm. 264, the suggestion merely set forth that the relator was a " citizen and resident of Philadelphia county, and as such, interested in the just and due administration of the laws therein, and sues," &c. This suggestion was to try the defendant's title to the office of county treasurer. The case was tried before King, President of the Common Pleas, and argued by able counsel, and the objection of want of special interest in the relator, was not suggested by anybody, although there he was not even a defeated competitor for the office. In this particular the statute was strictly followed, which says any one desirous to prosecute the writ may do so.

I have not been able to find a case, nor has any been referred to in argument on the part of the defendant, going to prove what is contended for, viz., that the relator, where the question involved is a county office, is required to exhibit any special interest in the controversy. It is *quasi* a criminal proceeding, and why may not any citizen prosecute the same, as in cases of misdemeanor or felony ? The Act of Assembly and the case referred to certainly show that he may. The cases cited do not prove the contrary : The Commonwealth *v.* The Bridge Co., 8 Harris 185 ; The Commonwealth *v.* The Germantown Railroad Co., Id. 518 ; and The Commonwealth *v.* The Farmers' Bank of Schuylkill Co., Id. 415, were cases of corporations ; and it was decided that no private relator could move to take away the corporate franchise of a company organized for public purposes. That the attorney-general was the proper officer to file the suggestion. So in The Commonwealth *v.* Burrell, 7 Barr 34. These cases obviously furnish no rule for a case of this kind. The franchises assailed were public and general, and so was the office of president judge, not local and domestic, as is a county office. As neither the Act of Assembly nor any decision teaches any other doctrine, I am of opinion that a private relator, a citizen and taxpayer of a county, has a right to file the suggestion necessary to lay the foundation

[Commonwealth *v.* Cluley.]

for the writ of quo warranto to test the validity of claim or right to a county office. He has the right, in my opinion, by virtue of his membership of the municipal corporation. This I think the law intended.

But has not the relator in this case an interest? He was the defeated competitor for the office when the defendant was declared elected. I think he has an interest in trying who is entitled to the office. He had votes enough to elect him, if there were no legal votes or legal candidate in the field against him; and certainly, being declared defeated, he has a right to have this tried if he can suggest grounds to show probable cause that his competitor was not elected, or entitled to hold the office. If he has not, no other private party could; and as the attorney-general is not bound to interfere in mere municipal contests, a great wrong might, and would, often go unredressed. Besides, this rule would abolish the rule well understood, that the intervention of the attorney-general is only required in regard to state offices and public franchises. It seems to me this ought to be a sufficient answer to this objection.

But farther:—

In the election laws, wherever a contest is authorized, it is usually required that there be a contestant, and that is always the defeated candidate, although sometimes the result is a new election. This is something like a recognition of an interest in the contestant. In fact, the absence of such an interest as a title to the office, cannot be an objection if we regard the 15th section of the Act of 1840. That provides that the court may decide against both parties in the contest, and may order a new election. But according to the argument, the controversy would necessarily cease the moment it should appear that the relator had no title to the office, and thus a new election might never be allowed. I think this conclusively shows that it is not indispensable that it should appear that the relator is entitled, or primâ facie entitled, to the office; and this is the only special interest a relator ever can have. Whether a relator has this interest or not, he has a right to go forward to try the question, not only whether he shall have the office, but, if not, to show that neither shall. In this last event, he would undoubtedly have no interest, as the result would necessarily demonstrate.

But I confess my inability to see, if it must be treated as a preliminary question, why, if the constitutional disqualification of the defendant be established, the relator is not entitled to the office. He had votes enough to elect him if the votes given for the defendant be regarded as thrown away. This cannot be disputed. It seems to me this position cannot be controverted, that if the votes cast for the defendant would not confer the office on him, that they did not possess the faculty or capacity of depriving

[Commonwealth *v.* Cluley.]

the plaintiff of his election, having, as already said, enough legal votes to elect him. The majority of votes cast operates only in one direction, namely, to elect, and by electing, defeat any competitor; but without electing, I deny that the effect is to defeat a competing candidate. The thing is not possible. If it were, a majority of votes for a fictitious candidate, or one notoriously ineligible, would defeat an eligible candidate. The elective franchise cannot operate in such a way. If people do not vote generally, they consent that those that do may elect. This is the rule in all popular elections. If, therefore, people do not vote for candidates who can by law exercise the offices voted for, it seems to me to follow that they tacitly consent that those who do vote for such as are eligible, shall elect on equivalent principles. It never can be an answer to this position, that the electors did not know of the ineligibility of the candidate. If such an excuse were good for anything, it ought to be good to render effective the votes for the ineligible candidate, and thus give him the office in spite of the existing disqualification.

I admit an absence of authority on the points I have thus assumed, but I regard them as resulting necessarily from the laws regulating elections. In England there are numerous cases of corporation elections of disqualified persons, in some of which the elections were regarded as nullities, so completely, as to authorize new elections without proceedings to declare the office vacant. In all, disqualification was a certain ground of ouster: Wilcox on Corp., Part I., marg. pp. 492 to 512 inclusive. In the case of The Commonwealth *ex rel.* Clark *v.* Read, *supra,* the defendant was held to have been elected treasurer by the county board, having received but one legal vote out of twenty cast. Nineteen were cast *vivâ voce,* and one by ballot, which was the mode prescribed by law, and it was held that this constituted an election. The nineteen cast away their votes, and by so doing permitted the twentieth man to elect. So here, I think, the same rule should apply. The majority of the voters did actually, though not intending it, throw away their votes by voting for a candidate who, by the terms of the Constitution, was incapable of holding the office. The people have no more right, unless in their primary legislative capacity, to dispense with the Constitution, than their servants, the legislature and the courts, have. And it is the positive duty of the latter not to permit it to be done by any merely pretended authority; and in my view of the obligation, no mere technical or formal matter should be permitted for a moment to prevent redress, when it is plain the Constitution has been violated. I regard the special interest in this relator as entirely sufficient. I might acquiesce in the rule insisted on where a by-law of a corporation is claimed to have been violated, or even in case of an Act of

[Commonwealth v. Cluley.]

Assembly in special cases, but I cannot where the great fundamental law, the Constitution, is invaded.

It is not an answer to all or any of this, that Mr. Cluley is a good officer and a highly respectable gentleman. I am happy to admit he is both; or that his first commission was accepted and exercised for the benefit of the deceased sheriff's family. Let that be set down largely to his credit as a man, but that will not cancel the effect of his first commission on his second. That step is irretrievable. It makes one of two commissions within less than six years. The Constitution prohibits this in regard to the office of sheriff in any period less than six years. The violation of the Constitution is therefore plain and palpable; as clearly so as if Mr. Cluley had been the sheriff on the day it is claimed he was elected in 1866. The only difference would be in degree and not in principle. Nor is the nullifying effect of the constitutional prohibition to be avoided on the ground that the small period of time during which he held a commission, being for the balance of Sheriff Wood's term, is to be regarded as a mere continuation or extension of Wood's commission. Length of time or duration of the commission is nothing to the purpose. The words of the Constitution already quoted are—" No person shall be TWICE CHOSEN or APPOINTED sheriff IN ANY TERM OF SIX YEARS." It is the number of the commissions which is forbidden. The length of time has nothing to do with it. Here there were two commissions within the prohibited period. The first destroys the last; and so we should say if the facts be as alleged and not denied. For these reasons, and many others that might be assigned, I am for allowing the writ of quo warranto to issue in this case.

I do not regard instances of legislative action as furnishing a judicial rule in regard to who is, or is not, entitled to an office, where the candidate having the greatest number of votes is held as entitled to a seat. Results in such cases are unfortunately so often controlled by party feeling, that they ought not, generally at least, to be regarded as fixing any rule of law on the subject. Besides, the nature of the authority of the legislative body over their members, is exercised under an authority in the body, that is not responsible to any appellate tribunal, and it is as frequently exercised on purely legislative as on judicial principles; and oftener on party grounds than on either. I take no account, therefore, whatever, of those cases here or in England, which have been cited on this point.

I regret to differ with the majority of the court in this case; but doing so, seemed to require at my hands some reasons therefor, and I have given some of the many which I feel to justify me therein.