# Sherman *v.* Yiddisher Kultur Farband, Appellant.

Argued May 26, 1953. Before Stern, C. J., Stearne, Jones, Bell, Chidsey, Musmanno and Arnold, JJ.

*Hymen Schlesinger,* for appellant.

110

*Harry Alan Sherman,* for appellees.

*Frank P. Lawley, Jr.,* Deputy Attorney General, and *Robert E. Woodside,* Attorney General, amicus curiae, filed a brief.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, October 15, 1953:

May petitioners, who are not members of a nonprofit corporation, intervene and petition the court of common pleas to revoke its decree of incorporation, upon the ground that such decree had been obtained through fraudulent misrepresentation?

The Yiddisher Kultur Farband, also known as Jewish Culture Association, in proceedings under the Nonprofit Corporation Law of May 5, 1933, P. L. 289, obtained a charter from the Court of Common Pleas of Allegheny County on *May 22, 1944.* The application stated that the purposes for which the corporation was formed were to encourage the study of Jewish literature, arts, and cultural pursuits, together with a number of similar objectives.

Samuel Louis Sherman and Paul Ginsburg filed a petition in that court as of the original term and number at which the charter was granted, in which petition they pray that they be permitted to intervene specially as parties. They allege that the incorporators, directors and officers wilfully, maliciously and corruptly perpetrated a fraud upon the court by misrepresenting the purposes of the corporation, "its true and clandestine purpose being the establishment of a Communist formed, controlled and directed 'front' for unlawful purposes," and that the existence of the corporation constitutes a continuing fraud upon the court and a gross abuse of the corporation laws of the Commonwealth. They aver, therefore, that, after

investigation of the facts, the charter of the corporation should be revoked and punitive measures taken against the persons responsible. The court granted leave to the petitioners to intervene and fixed a time for a hearing. The Association, by its counsel, filed preliminary objections. The court below announced its intention to take testimony in order to determine whether the alleged fraud was in fact committed. The Association has appealed to this Court under the Act of March 5, 1925, P. L. 23, 12 PS 672, which authorizes an appeal where on preliminary objections, the jurisdiction of a court is raised. There is no question that a court of common pleas possesses jurisdiction to revoke its decree of incorporation, but such proceeding must be instituted by interested parties and in an appropriate statutory action.

All corporations, whether for profit or nonprofit, are creatures of statute, which prescribes not only how they shall be formed but how they shall be dissolved: Act of May 5, 1933, P. L. 364, as amended, 15 PS 2852, and Nonprofit Corporation Law of May 5, 1933, P. L. 289, as amended, 15 PS 2851. This Court has consistently decided that in corporations formed for profit the Attorney General, by an action of *quo warranto,* is the appropriate official to petition for the dissolution and termination of an improperly formed or illegally conducted corporation: *Centre and Kishacoquillas Turnpike Road Company v. McConaby,* 16 S. & R. 140; *Commonwealth ex rel. v. American Baseball Club of Philadelphia,* 290 Pa. 136, 138 A. 497; *Commonwealth ex rel. v. United States Annuity Society,* 303 Pa. 19, 154 A. 24. Section 209 of the Act of May 5, 1933, supra, 15 PS 2851-209, under which the present nonprofit corporation was formed, provides: "The articles of incorporation, approved by a judge and recorded by the recorder of deeds, shall be conclusive evi-

dence of the fact that the corporation has been incorporated, *but proceedings may be instituted by the Commonwealth to dissolve, wind up and terminate a corporation which should not have been formed under this act or which has been formed without a substantial compliance with the conditions prescribed in this act as precedent to incorporation.*" (Italics supplied) The statutory remedy of revocation is by the Commonwealth in an action of *quo warranto.*

Petitioners possess no status as interested parties in this proceeding. The Act of June 14, 1836, P. L. 621, §2, 12 PS 2022, provides that the writ of *quo warranto* may be issued "upon the suggestion of the Attorney General, or his deputy, in the respective county, or of any person or persons desiring to prosecute the same." But the words "any person desiring to prosecute the same" have uniformly been held to mean a person having an interest of his own to be affected, or a wrong to be redressed, separate and distinct from that of the Commonwealth or the community in general; they do not give a private relator the use of the writ in a case of public right involving no individual grievance. In short, a stranger who has no interest in a corporation except that which is common to every citizen cannot demand a judgment of ouster in a writ of *quo warranto: Commonwealth v. Allegheny Bridge Co.,* 20 Pa. 185, 190; *Murphy v. Farmers' Bank of Schuylkill County,* 20 Pa. 415, 418; *Commonwealth ex rel. Banning v. The Philadelphia, Germantown and Norristown Railway Co.,* 20 Pa. 518; *Commonwealth ex rel. McLaughlin v. Cluley,* 56 Pa. 270, 272; *Commonwealth ex rel. Attorney General v. Dillon,* 81 Pa. 41, 45, 46; *Commonwealth ex rel. Butterfield v. McCarter,* 98 Pa. 607, 612-614; *Commonwealth ex rel. Gast v. Pfromm,* 255 Pa. 485, 489-491, 100 A. 276, 277, 278; *Commonwealth ex rel. Attorney General v.*

*American Baseball Club of Philadelphia,* 290 Pa. 136, 144, 138 A. 497, 500; *Commonwealth ex rel. Schermer v. Franek,* 311 Pa. 341, 344, 166 A. 878, 879, cf. *Wiegand v. The Barnes Foundation,* 374 Pa. 149, 97 A. 2d 81. The present petitioners are merely informers without any peculiar interest of their own, and if they were to be permitted to institute *quo warranto* proceedings the same right would exist on the part of each and every citizen of the Commonwealth however irresponsible, however improperly motivated, he might be. If the Association here is what petitioners allege it to be the situation is one of public concern and a public wrong, not a private injury, and, as such, it is for the Commonwealth and for it alone, acting through the Attorney General, to apply for the issuance of a writ of *quo warranto.*

The order of the court below is reversed. The preliminary objections are sustained, and the petition is dismissed. Costs to be paid by appellees.

---

DISSENTING OPINION BY MR. JUSTICE BELL:

A Court has a fundamental and inherent right and power to correct its records and to modify, change or vacate a decree whenever such record or decree has been obtained by fraud; and such power may be exercised (a) sua sponte, with or without an amicus curiae, or (b) in a proper proceeding by a party having a right or interest therein, or (c) in certain cases, in a quo warranto proceeding brought by the Attorney General. The majority opinion admits, as it must, the jurisdiction as well as the basic power of the Court to vacate its decree when obtained by fraud: *Macoluso's Naturalization,* 237 Pa. 132; *Cochran v. Eldridge,* 49 Pa. 365; *Sallada v. Mock,* 277 Pa. 285; cf.

also *National Endowment Co.*, 142 Pa. 450; and neither the common law nor any statute or decision of this Court declares the last remedy to be exclusive.

The Act upon which the majority relies, i.e., §209 of the Nonprofit Corporation Law of 1933 provides that "proceedings *may be** instituted by the Commonwealth to dissolve, wind up and terminate a corporation which should not have been formed under this act." It is crystal clear that this provision is permissive or directory not mandatory or exclusive.

The decision of the majority is not only based upon an act which being permissive, utterly fails to support its position, but it is likewise contrary to prior decisions of this Court, which require this appeal to be quashed or dismissed. This is not an appeal from a final judgment, order or decree; this is an appeal under and limited by the Act of 1925. In *Com. ex rel. Shumaker v. New York & Pennsylvania Co., Inc.*, 367 Pa. 40, 79 A. 2d 439, the Court said (page 46): ". . . The narrow scope to which this inquiry must be confined was clearly restated recently by Mr. Justice JONES in Upholsterers' International Union etc. v. United Furniture Workers, etc., 356 Pa. 469, 52 A. 2d 217 (1947), where he said, p. 472, 473, 'The procedure prescribed by the Act of 1925 for testing jurisdiction "in the court of first instance" *applies to questions of jurisdiction either of the defendant or of the subject-matter*: Welser v. Ealer, 317 Pa. 182, 184, 176 A. 429. In the present instance, the question involved goes to the jurisdiction of the cause of action (whereon the suit was instituted) which ". . . relates 'solely to the competency of the particular court to determine controversies of the general class to which the case then presented for its consideration belongs': Skelton v.

---

* Italics throughout, ours.

Lower Merion Twp., 298 Pa. 471, 473. See also Koontz v. Messer, 314 Pa. 434": Welser v. Ealer, supra . . . The thing of chief importance on a question of jurisdiction of subject-matter is not whether the plaintiff may recover in the particular forum on the cause of action pleaded but whether the court is empowered to hear and determine a controversy of the character involved: Matthews v. Plum Township, etc., 152 Pa. Superior Ct. 544, 546-547, 33 A. 2d 38.' "

In *Welser v. Ealer,* 317 Pa., supra, this Court said (page 183-184) : "This case is before us by virtue of the provisions of the Act of 1925, P. L. 23, authorizing an appeal from the preliminary determination of the lower court's 'jurisdiction over the defendant or of *the cause of action* for which suit is brought.' The action is in trespass to recover damages for injuries resulting from an automobile accident. . . . Manifestly it has jurisdiction over the cause of action alleged in the statement, namely, trespass to recover damages for personal injuries. *No other matters are open for inquiry* in proceedings of this nature. Jurisdiction of the cause of action, as used in the statute, relates 'solely to the competency of the particular court to determine controversies of the general class to which the case then presented for its consideration belongs': Skelton v. Lower Merion Twp., 298 Pa. 471, 473. See also Koontz v. Messer, 314 Pa. 434."

The majority opinion necessarily admits that the Court below had jurisdiction over the defendant and over the subject matter or cause of action, viz., fraud, as well as the power to determine controversies of the general class to which the case belongs, viz., the grant and revocation of charters of nonprofit corporations. The majority dismiss this appeal on procedural grounds and because the parties plaintiff have no interest in the suit, thus flying in the teeth of the foregoing authorities

which they ignore and which *specifically hold that no such matters are open for inquiry* in an appeal *under the Act of 1925.* Mercy, equity, justice, changed conditions or modern times may impel a Court to modify or reverse prior decisions, but no such reason or justification exists in this case. For this additional reason, the opinion of the majority is untenable.

The pleadings allege (and the Court below heard testimony which up to now has not been contradicted) that this charter was fraudulently obtained to teach, foster, advocate and spread Communism instead of its chartered purpose of promoting Jewish culture.

It is at long last recognized, legislatively, judicially and by public officials that a major objective of Communism is the overthrow of our Government by sabotage, violence, and revolution. To counteract this and to protect our Country from its mortal enemies, we need the aid not only of all our public officials, agencies, and Courts but also of every patriotic American citizen. A Court's power to revoke a decree obtained fraudulently is clear and unquestioned; the only question is whether it must suppress or nullify its own fundamental powers, jeopardize the interests of our Country, and call upon a very busy and distant Attorney General to institute the proceedings. If there were any doubt on this question—and in my opinion there is none—it should not be resolved in favor of those who are charged with advocating and plotting the destruction of our Country.

How untenable, unrealistic, and unwise is the majority opinion which gives to the Attorney General, who has a multiplicity of other important duties, the sole and exclusive power to vacate a fraudulent decree and to protect the security of our Country and the safety of our citizens, is further apparent from the Attorney General's brief: "The rule asked for by the

appellant [and adopted by the majority] make the courts dependent upon the Attorney General; if the Attorney General capriciously or arbitrarily refused to bring an action of quo warranto, the court would be powerless to cleanse itself of the fraud. It is submitted that *such is not the law of Pennsylvania nor is it desirable.* On the other hand, *the rule as announced by the court below fully protects the court and in no way limits the power of the Attorney General* to bring quo warranto where fraud is present, since Section 209 of the Act of 1933, supra, provides that proceedings may be instituted by the Commonwealth to dissolve, wind up and terminate a corporation 'which should not have been formed.'

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

"It is respectfully submitted that the appeal in this case be dismissed and the action of the court below affirmed."

I would sustain and protect the fundamental powers of our Court, and like the Attorney General, I would not limit or restrict the protection of our Country in these critical times to one administrative department of our Government. Especially would I not do so, when the head of that department, viz., the Attorney General of Pennsylvania, although imbued with a high sense of patriotism and conscientious discharge of duty, asserts that such exclusive delegation of power is neither necessary nor desirable or even legal.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

On May 8, 1944, eight individuals in Pittsburgh petitioned the Court of Common Pleas of Allegheny County to be awarded a charter for a proposed corporation to be entitled the Yiddisher Kultur Farband. In

their application these persons set forth that the purposes for which the corporation was to be formed were to encourage the study of Jewish literature, music, painting and sculpture; to foster among its members and others an interest in such cultural aims; to cultivate the cultural level of its members; to assist and encourage Jewish writers, scientists, musicians, painters, sculptors and artists generally; and to stimulate interest in Jewish education and art in various other and sundry ways.

No one appearing in court to controvert the statements of the incorporators, the Court, undoubtedly impressed by the representations as to the idealistic character of the proposed corporation, granted the petitioned-for charter, and on May 22, 1944, the Yiddisher Kultur Farband came into being.

On March 23, 1953, a petition by two other individuals was presented in the Court of Common Pleas setting forth, under oath, that the cultural objectives enumerated in the application for the charter of the Yiddisher Kultur Farband constituted a false curtain painted by skillful word artists, and that, behind the camouflage of phraseology, a group of malefactors were engaged in Communist front activities. The petition made clear that what the Yiddisher Kultur Farband was cultivating was not the cultural level of its members but slavish adherence to Communist doctrine. The petition averred that the Court of Common Pleas had been deceived into granting a charter to an organization engaged in an illegal venture. If the petitioners' averments are true, it would be difficult to imagine a more hideous fraud than this one, designed, as it was, to obtain legal sanction for an enterprise committed to the destruction of the government of the nation and of the Commonwealth of Pennsylvania, together with the Court of which it forms a part. That that is the pur-

pose of the Communist Party and all its affiliates is no longer open to debate or question.*

Acting upon the petition of March 23, 1953, Judge Ellenbogen, then presiding in the Court of Common Pleas of Allegheny County, issued a rule on the corporation to show cause why its charter should not be revoked. The corporation filed no answer denying the accusatory averments. A hearing was scheduled for March 31st, later continued to April 2, 1953. On the latter date testimony was taken which verified the accusation in the petition. One of the original incorporators, Joseph Saul, called for cross-examination, was asked if he ever belonged to the Communist Party. He refused to answer on the ground that his answer would involve self-incrimination. This silence on so vital a question might save him from criminal prosecution but it cannot prevent formation of the logical inference which follows such an ostrich concealment behind the Fifth Amendment. Saul's muteness speaks loudly as to the real purpose of the Yiddisher Kultur Farband.

This organization is not one of trifling means. It is housed in a magnificent, spacious, two and one-half story gray stoned manse at 6328 Forbes Street, Pittsburgh, in a high class residential district. In order to avert suspicion the incorporators did not purchase the building outrightly in the name of the organization. Joseph Saul obtained title to the land and building and then conveyed it to the Yiddisher Kultur Farband. Because the building is supposedly the home of a cultural society, this subversive organization which owns and occupies it enjoys an 85% exemption in taxes. (The 85% exemption of course must be made up by the rest of the taxpayers.)

---

* *Dennis et al. v. U. S.,* 341 U. S. 494; *Albert Appeal,* 372 Pa. 13; *Com. v. Truitt,* 369 Pa. 72, 81, 91-2.

While the Court of Common Pleas was still taking testimony in verification of the allegations in the petition, Attorney Hymen Schlesinger entered an appearance de bene esse for the defendant corporation and appealed to the Supreme Court of Pennsylvania, asserting that the Court of Common Pleas was without jurisdiction to entertain and consider the cancellation-seeking petition.

The majority of this Court has now decided that Schlesinger's position is well taken. The majority says that only the Attorney General has the right to initiate quo warranto proceedings to dissolve a corporation. But this is not a quo warranto action at all. This is simply a proceeding wherein a sworn petition informs the Court that a gross fraud has been perpetrated upon it and it asks the Court to uncover the fraud and revoke the charter obtained through that fraud. The Court of Common Pleas is asked to correct a grievous error. That was and is the purpose of the petition of March 23, 1953. The majority has not cited, nor is there any authority in all the law books which says that a court may not cleanse its own records, once it is proved that they have been contaminated by a perjurious hand, leprous with deception, deceit and betrayal.

The object of a court is to render justice. In the achievement of that end, judgments are pronounced, modified, altered and cancelled; verdicts are reversed; new trials are ordered; decrees are rescinded and others substituted—all in accordance with facts presented and judicially evaluated. Every tribunal in the United States does honor to the venerable rule that courts possess inherent power to control, amend, open and vacate their decisions according to circumstance, and especially where vitiated by fraud. Many pages would be required to enumerate the authorities com-

ing down through the centuries upholding this fundamental rule of jurisprudence and procedure. It is enough here to quote from two or three decisions of our own Court. In *Macoluso's Naturalization,* 237 Pa. 132, we said: "The authority to vacate, open or set aside a judgment or decree *is incident to all courts of record,* of general jurisdiction, and extends to granting relief by opening or vacating such judgments or decrees as are utterly void and mere nullities: 23 Cyc. 893."*

In *Cochran v. Eldridge,* 49 Pa. 365, the scholarly Chief Justice WOODWARD wrote: "That wholesome maxim of the common law, that fraud vitiates whatever it touches, makes no exception of judgments at law. No court of justice will set aside or even be led to look into a solemn judgment on light or trivial grounds; but when it is alleged upon adequate proofs that a judgment in whole or in part has been obtained by a suppression of truth which it was the duty of the party to disclose or by the suggestion of a falsehood or by any of the infinite and therefore undefinable means by which fraud may be practised, *no court will allow itself, its records, and the process of law to be used as instruments of fraud."*

In *Sallada v. Mock,* 277 Pa. 285, we said: "Courts, when appealed to, will prevent the triumph of fraud, and, where a judgment has been obtained by fraud, no court will permit its records and processes to be the instruments of infamy . . . *Relief may be granted by opening or vacating such void judgments or decrees, as mere nullities.*

After such powerful and determined utterances, how can a Court of this Commonwealth stand idly by when it is made aware that its records and processes are being used as "instruments of infamy?"

---

* Italics throughout, mine.

The majority opinion concedes: "There is no question that a court of common pleas possesses jurisdiction to revoke its decree of incorporation," but it destroys that concession with the condition that a court can only act when "interested parties" intercede in an "appropriate statutory action." The fraud in this case was perpetrated not upon another individual or group of individuals; it was visited upon *the Court itself*. Since a decree obtained as a result of fraud is a mere nullity, a Court of Common Pleas certainly has the power to so declare it; and after so declaring, it must act. Otherwise the power which the majority admits a Court possesses to vacate decrees procured by fraud, is sheerly meaningless.

To say that a court does not have the right to revoke a decree is like saying that a general has no right to change a military order; that a ship's captain may not alter the course of his vessel; that an aviator may not deviate from the scheduled orbit of his flight though a strange aircraft appears before him; that a doctor may not rewrite a prescription even though new symptoms dictate a different treatment. Under this line of reasoning a judge may not change a punishment even though newly revealed facts and renewed reflection convince him the first sentence was unjust. This type of reasoning rips from the ship of dutiful performance the rudder of responsibility; it tears from the ordnance of correction the guiding sight of accuracy.

The majority opinion collides squarely with the authority of *National Indemnity and Endowment*, 142 Pa. 450. There the Court of Common Pleas of Mc-Kean County was induced to grant a charter to certain incorporators who asserted the formation of "a society for beneficial and protective purposes to its members from funds collected therein." Later, the

Court learned that the incorporators had deceived the Court into believing that the corporation benefits were to go only to members of the corporation. In point of fact the incorporators planned to sell their insurance commodity to non-members. The Court, once it got this information, issued *on its own motion,* a rule on the corporation to show cause "why the order approving its charter should not be revoked, for the reason that the purposes and the objects of the corporation did not come within the provisions of the act of April 29, 1874, P. L. 73, and its supplements," and for the further reason "that the court was led into an error in certifying that its purposes were lawful and not injurious to the community."

The Common Pleas Court then, on its own initiative, appointed an auditor to take testimony. Upon receiving the report of the auditor the Court announced: "A careful examination of the petition, leads us to the conclusion that the purposes and objects of this company come nearer a scheme to cheat and defraud than a beneficial society. We are satisfied that we made a grave error, in granting the certificate of incorporation, and that it was *void ab initio.*" The incorporators appealed to the Supreme Court of Pennsylvania and this tribunal, after outlining the procedure followed in ascertaining the facts of the fraud, perpetrated upon the lower court, said: "We are in no doubt of the power of the court to revoke this alleged charter. It never was a charter. It was not authorized by any act of assembly, and is absolutely void . . . A void charter confers no rights, and the court below was justified in revoking the order which gave it an apparent validity."

How does this National Indemnity and Endowment case differ from the case at bar? Here the Court issued a rule on the Yiddisher Kultur Farband to show cause

why its charter should not be revoked and the Court heard testimony which convinced it, at least prima faciedly (because the hearing had not terminated when the appeal was taken) that a gross deception had been perpetrated on the Court. If the *National Indemnity and Endowment* case is still good law, and its colors have not been struck, we are bound by *stare decisis* to respect its authority and to affirm that the Court of Common Pleas of Allegheny County has the right to vacate the fraudulently obtained decree of the Yiddisher Kultur Farband.

The majority opinion indicates that a Court can only learn of an error through official and formal procedure. This is like saying that a lost article can only be found by a policeman. How does the manner of discovery affect the seriousness of the knowledge gained thereby? A Court may learn of the victimizing fraud by inquiry, by investigation or even by accident. And certainly it may learn of the fraud through a petition filed in Court. In the *National Endowment Case* the Court discovered the fraud by itself and, as stated above, it acted *sua sponte* in undoing the harm caused by the granting of the undeserved charter.

The majority opinion emphasizes that the two petitioners in this case were not members of the Yiddisher Kultur Farband. It is not to be expected that those who actually participated in the original fraud or are at present enjoying its meretricious benefits would petition the Court. If the law must wait on the intervention of outlaws it will wait a long time for its vindication. In a case like this, the petition, if it is to come at all, must perforce come from some one not within the illegal organization.

The majority says that "the present petitioners are merely informers without any peculiar interest of their own, and if they were to be permitted to institute

*quo warranto* proceedings the same right would exist on the part of each and every citizen of the Commonwealth however irresponsible, however improperly motivated, he might be." In the first place, these proceedings are not quo warranto proceedings, and in the second place I see no reason why any citizen in the Commonwealth should not have the right to acquaint the Court with facts which will correct a great evil and prevent irreparable harm from befalling the community and the country. If what the petitioners say is true, the Yiddisher Kultur Farband is harboring Communist agents who are conspiring against the security of the United States. Is that to be treated lightly? Are we to shut the door in the faces of volunteers arriving to tell us of the flood lapping at the foundations of our home or the fire approaching our front porch?

If it should appear in court proceedings that the petitioner is irresponsible or is improperly motivated his shortcomings will be quickly detected. However, the harassment or annoyance of an occasional ill-advised petition is of no consequence whatsoever in comparison to the great peril which could befall the safety of our courts if they were not permitted to accept and consider petitions which in apparent good faith ring an alarm bell of present and continuing danger.

The majority states that to entertain the petition of the two petitioners in this case would be to authorize "each and every citizen of the Commonwealth" the right to intervene. I always understood the law in the United States to be that any aggrieved citizen had the right to petition in an appropriate manner for a redress of grievances. Whether there is merit to a petition is something that will be ascertained readily. And when one considers the expense, time and incon-

venience attendant upon court proceedings of any kind, it is not likely, except where mental irresponsibility is involved, that many petitions will be presented except upon cause.

And then, even if it were to be ascertained that, although the petition averred a truth, an improper motive lurked behind the disclosure, how would that affect the question as to whether a fraud had been committed? Even a thief may report a burglary for the purpose of seeking revenge on a co-thief, but the law would not ignore such a complaint merely because it was propelled by a base motive.

The majority opinion would almost seem to call the petitioners interlopers. They are referred to as "informers without any peculiar interest of their own." One of the petitioners, Paul Ginsburg, is an attorney at law and as such is an officer of the court. He, therefore, has a justifiable interest in the integrity of the court's decrees. When he testified in the lower court he said that upon learning of the fraud committed by the incorporators of the Yiddisher Kultur Farband he felt he had a duty to acquaint the Court with what he had ascertained. He testified: "I would say my interest in this proceeding, of course, is primarily as an American citizen, and more pertinently now, as an officer of this Court. I thought I should help bring to the attention of this Court the existence of a fraud which was perpetrated upon it in connection with the application for the charter of this organization. It is not only my interest and duty as an American and as a taxpayer, but also I would be violating the Canons of Professional Ethics, in my opinion, if I did not do so."

The other petitioner, Samuel Louis Sherman, is also an American citizen, and that in itself should be enough authority for him to enter an American tri-

bunal to report that enemies of the State, under the false banner of culture, are marching against the ramparts of our safety. In the days of ancient Rome, no greater honor could be conferred on an inhabitant of the Empire than to declare him a citizen of Rome. Roman citizenship imposed duties and obligations, but it also clothed the person with sovereign rights which were inalienable and inviolable. The rights of an American citizen in this, the greatest Republic in the wide arch of ranged history, is no less glorious and no less entitled to respect in the courts of the nation. Samuel Louis Sherman is a man of family, he owns property and he has an interest, even pecuniary and direct, in the security of this nation which is being jeopardized by the activities of the Yiddisher Kultur Farband. As a taxpayer Mr. Sherman, as well as Mr. Ginsburg, is directly concerned in the fact that the Farband receives a bonus of 85% in unpaid taxes. Sherman and Ginsburg and the other good and faithful citizens must supply the 85% deficiency to the treasury. Samuel Louis Sherman has a further direct interest in these proceedings because of the fact that he is a member of the patriotic organization known as Americans Battling Communism. Thus, Mr. Sherman's interest is solid, substantial and sincere. It is my earnest belief that the two petitioners in this case are entitled to the gratitude of the community for their public spiritedness in taking the initiative to bring to the attention of the courts the fact that one of its edicts and decrees is being perverted to a use never intended by the court.

On the day that this case was orally argued before this Court in the Capitol at Harrisburg, the able Attorney General of the Commonwealth ROBERT E. WOODSIDE (now Judge of the Superior Court) stepped into the courtroom and he was asked from the bench wheth-

er, in his opinion, the Court of Common Pleas could of its own motion revoke a corporate charter which had been obtained through a fraud practised upon it. The Attorney General replied to this question in the affirmative. He later filed a written brief supporting this position. He said further that while there were certain cases where the intervention of the Attorney General was in order and even required, this was not one of those cases.

Section 2851, (209) of the Nonprofit Corporation Law (Title 15 Purdon's Digest) provides: "The articles of incorporation, approved by a judge and recorded by the recorder of deeds, shall be conclusive evidence of the fact that the corporation has been incorporated, but proceedings *may be instituted* by the Commonwealth to dissolve, wind up and terminate a corporation which should not have been formed under this act or which has been formed without a substantial compliance with the conditions prescribed in this act as precedent to incorporation."

It will be noted that this Act states that the Commonwealth *may* act to dissolve a corporation. It does not say that it must act. Nor does this provision indicate that the Commonwealth's intervention is desired, or even permitted where the question involved is whether a corporation's charter should not be revoked because obtained through fraud. And it is to be particularly noted further that the Corporation Act does not deprive the Court of its inherent powers to correct its records and vacate decrees improperly obtained, it specifically stating that the Act "shall not be deemed to curtail in any manner whatsoever the law or equity jurisdiction of the courts of this Commonwealth." (1933, May 5, P. L. 289, art. I, sec. 7—Sec. 2851, Par. 7, Purdon's)

Addressing himself to this specific proposition the Attorney General said in his brief: "The rule asked for by the appellant [the Yiddisher Kultur Farband] *would make the courts dependent upon the Attorney General*; if the Attorney General capriciously or arbitrarily refused to bring an action of quo warranto, *the court would be powerless to cleanse itself of the fraud.* It is submitted that such is not the law of Pennsylvania nor is it desirable." In spite of this forthright declaration on the part of the Attorney General, the majority opinion here insists that a Court cannot act without the Attorney General's intervention. In spite of this respectful declination on the part of the Attorney General to participate in a manner which is strictly the business of a local Court, this Court insists, without any power to make its insistence valid or enforceable, that the Attorney General in Harrisburg is the only one who can initiate proceedings in Allegheny County to correct an error in an Allegheny County Court record.

The majority opinion says further: "If the Association here is what petitioners allege it to be the situation is one of public concern and a public wrong, not a private injury, and, as such, it is for the Commonwealth and for it alone, acting through the Attorney General, to apply for the issuance of a writ of quo warranto." But suppose, as now Superior Court Judge Woodside honestly and realistically put the proposition, the Attorney General capriciously or arbitrarily refuses to bring an action of quo warranto, what then? The answer, in the words of Judge Woodside, is that the "court would be powerless to cleanse itself of the fraud." There would be no way to force the Attorney General to act since the statute only says that the Commonwealth *may* intervene. The refusal of the Attorney General to act could not be considered as non-

feasance or malfeasance in office because the law does not impose on him the procedure suggested. Thus a proved fraud would stand uncorrected because the court could not act and the Attorney General would not act. Justice, always portrayed as blindfolded, would in this instance be armless as well. The majority opinion would cripple and hamstring the courts of Pennsylvania in a manner suggestive of some tyrannical regime. It would make the Courts subsidiary to the executive branch of the government. Although up until now the courts have been regarded as the guardians of the liberties of the people, this decision would declare that it is the Attorney General who shall determine if and to what extent the courts may lift the sword of the law to strike down the serpent of falseness admittedly within the temple of justice.

What the majority opinion does here is to abdicate the power of the judiciary to correct injustice, to root out fraud, to uncover deceit and to stay the advance of a recognizable and certain evil force moving on the citizenry within its jurisdiction and entitled to its protection.

The majority decision strikes at the very vitals of the independence of the judicial department of the government. It holds that the courts made up of a judiciary elected by the people shall be at the mercy of a non-elected official who may be hundreds of miles away. It says that no matter what may be the evidence of the fraud, or the proof of the deceit, or the extent of the treachery perpetrated upon the courts, the Courts are helpless. The courts are made to wait on the Attorney General who may delay, ignore, procrastinate or deliberately refuse to intervene. The Courts, heretofore always occupying the throne of justice, would be left sitting on the doorstep waiting and hoping. It is a humiliation that beggars description.

A particular Court knows it has been deceived and defrauded, it knows that the defrauders are continuing with their nefarious work, yet the Court is powerless to act because someone does not officially notify the Court of something it already knows. This indeed is an anomaly and a paradox that borders on catastrophe, and one in which I will take no part.

And who will be the beneficiary of this particular capitulation of the Courts? Some civic organization? Some charitable group? Some religious body? The incredible truth is that the Court in this case is yielding judicial power, not intentionally of course, but nonetheless actually and realistically to the fortuitous benefit of the most sinister, most deadly, most anti-American and most destructive organization in our land—the Communist Party of the United States.

I take judicial notice of the fact that sworn testimony before a United States Senate Committee has disclosed that the Yiddisher Kultur Farband is run by Communists, directed by Communists, inhabited by Communists, and that some of these Communists conduct classes in sedition and revolution. It was testified, under oath, that in this building, owned, controlled and operated by the Yiddisher Kultur Farband, instruction is imparted in the construction of hand grenades and bombs and that in the cellar of this structure a target range has been maintained.

It was within this organization that, according to the testimony of a former FBI undercover agent, statements were made regarding plans for the assassination of a United States Senator. I also take judicial notice of the fact that the Attorney General of the United States, after suitable investigation, declared that the Yiddisher Kultur Farband, (translated: the Jewish Cultural Association), is a subversive Communist front organization. Only several days ago, sworn

testimony was given before a United States Government inspector that in these same Farband headquarters, a banquet-party was held in honor of Steve Nelson, the nationally recognized Communist leader who, when asked before a Congressional investigating committee which country he would support in the event of war between the United States and Russia, replied: "I refuse to answer that question."

This, then, is the type of organization that this Court says must not be touched, must not be investigated, must not have its charter questioned until and unless the Attorney General decides to act.

The petition which called the attention of the Court to the fraud perpetrated upon it by the Yiddisher Kultur Farband was filed on March 23, 1953. Presumably the organization has been operating ever since. This is another illustration of how the Communist Party, judicially recognized as a criminal conspiracy working to overthrow our government by force and violence, can and does use our courts in the furtherance of its revolutionary plans. If, as the majority opinion indicates, the integrity of the Court's decrees are to be entrusted to the guardianship of the Attorney General, why has the Attorney General not acted heretofore? As long ago as February, 1950, Matt Cvetic, former FBI undercover agent, testified before the House Un-American Activities Committee, that the Yiddisher Kultur Farband was a Communistic organization. Why did the Attorney General not step in then with quo warranto proceedings and demand cancellation of the charter of this illegal enterprise? This fact alone demonstrates the impracticability—and the danger—of leaving to the Attorney General alone the responsibility of protecting decrees of our Courts of Common Pleas in the 67 counties of our Commonwealth. In addition to the other reasons already men-

tioned as to why the procedure outlined by the majority opinion is not feasible, there is the very important one that the Attorney General's office is not sufficiently staffed to provide watchmen and deputies in all the Courts of Pennsylvania to determine if and when any particular corporation chartered by the Court is committing a fraud on the Court.

The whole country is aroused, and properly so, by the Communist peril. We know that Communist agents have been discovered in all the departments of the United States government. We know that Communist spies have stolen the awesome atom and H-bomb secrets. We know that Communists have infiltrated into labor unions, into the professions, the arts, the sciences and we know they have polluted literary and cinematic streams. Within the next year or more, 25,000 flag-draped caskets will be returning from Korea and each one will contain, mingled with the mangled form of an American soldier, a Communist bullet or the fragment of a Communist shell or grenade. And 50,000 Communists in the United States will cheer that grim harvest because they are of the same brand as those who committed the slaughter in Korea. Among the ghouls sneering at the ineffable coffins will be not only the members of the Communist Party but the members of the Communist front organizations, of which the Yiddisher Kultur Farband is one.

Congressional investigations by the hundreds have revealed the manner in which the Communists have deceived the highest of American government officials. The most notorious of them all deceived the President of the United States and sat at his elbow recommending cessions of vast territory and uninhibited international power to Communist Russia. The people of the United States look to the Army, the Navy and the

Air Force for protection from the enemies these traitors have aided and comforted. But they have the right to look, above all, to the Courts for protection. As the Attorney General said: "The court's primary duty is to protect the community from injury and unlawfulness by a corporation. Its duty is not any less where it learns *after* granting the charter that it had been fraudulently misled, and the purposes of the corporation are not authorized." (Emphasis supplied by Attorney General.) But the court below is being prevented from doing this *primary duty*. And, as a consequence, a full-fledged Communist organization is being allowed to operate untrammeledly by a decision which does obeisance to form and overlooks substance, which evades responsibility, flouts logic, spurns realities, and abandons protection of that Court which is courageously asserting the integrity and the independence of constitutional judicial powers.

So that there may be no doubt about my position in this case I repeat that it is my considered judgment that, because of precedent and the innate jurisdiction residing in every Court of our Commonwealth to thwart fraud and correct error, Judge ELLENBOGEN had the authority of his own motion, as was done in the *Indemnity* case, supra, to ascertain whether the Yiddisher Kultur Farband charter was granted through fraud, and, once the fraud was discovered, he had the authority and the bounden duty to revoke that charter. Not only that, but it was within his power to sit as a committing magistrate on his own initiative to formally charge with crime those whom he believed were probably guilty of perjury or sedition in this transaction.

How long must this Communist front organization go on functioning? The Attorney General has declared

that he should not proceed and the majority of this Court declares that the Court of Common Pleas may not proceed. Are the people to remain helpless in a situation of admitted danger?

But in conclusion, I would emphasize that over and above the perilous contretemps created by the majority decision, that decision has wrought splintering damage to the inkstand of judicial independence resting on the bench of every judge in the Commonwealth of Pennsylvania.